**Joseph Patrick Thomas DOHERTY, Petitioner–Appellant,**

v.

**Richard L. THORNBURGH, Attorney General of the United States; Gene McNary, Commissioner of the Immigration and Naturalization Service; and, Scott Blackman, District Director of the Immigration and Naturalization Service, New York District, Respondents–Appellees.**

No. 1402, Docket 91–2044.

United States Court of Appeals, Second Circuit.

Argued May 6, 1991.

Decided Aug. 27, 1991.

Stephen A. Somerstein, New York City (Somerstein & Pike, Arthur C. Helton, Lawyers Committee for Human Rights, of counsel), for petitioner-appellant.

Stacey J. Moritz, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., Claude M. Millman, Edward T. Ferguson, III, Asst. U.S. Attys., of counsel), for respondents-appellees.

Before PRATT, MINER and ALTIMARI, Circuit Judges.

MINER, Circuit Judge:

Petitioner-appellant Joseph Patrick Thomas Doherty appeals from a judgment entered on November 13, 1990 in the United States District Court for the Southern District of New York (Cedarbaum, J.) denying his petition for a writ of habeas corpus. The petition is grounded on Doherty's prolonged detention without bond pending deportation as an illegal alien. Doherty has been held in detention since June, 1983 while extradition and deportation proceedings to return him to the United Kingdom, where he was convicted of murder, have been pending. An appeal in a separate action in which Doherty seeks political asylum in this country will be heard by the Supreme Court of the United States during its October, 1991 term. On appeal in this case, Doherty argues that his prolonged detention without bail violates the substantive due process clause of the fifth amendment. We hold that, under the circumstances revealed here, the eight-year detention of Doherty does not violate the fifth amendment, and we affirm the denial of the petition.

## BACKGROUND

Doherty is a native of Northern Ireland and citizen of the United Kingdom. On June 12, 1981, he was convicted *in absentia* by a court in Great Britain for the murder on May 2, 1980 of a British army captain, which occurred during a confrontation in Northern Ireland between members of the Provisional Irish Republican Army ("PIRA") and British soldiers. Two days before his conviction, Doherty escaped from a British prison. After a period of hiding in the Republic of Ireland ("Ireland"), Doherty entered the United States in February, 1982, using a false passport. With the help of American PIRA sympathizers, Doherty obtained false identification, joined a union, and began employment at a bar in Manhattan.

On June 18, 1983, federal agents apprehended Doherty at his place of employment pursuant to a warrant and order to show cause why he should not be deported, issued by the Immigration and Naturalization Service ("INS"). Doherty was detained at the Metropolitan Correctional Center ("MCC") in New York City without bail, where he has remained since without significant interruption. During a hearing held on June 27, 1983 to reconsider the denial of bail pending deportation, a United States Marshal for the Southern District of New York took custody of Doherty pursuant to a warrant of provisional arrest for

extradition to Britain issued under a treaty between the United States and that country. At Doherty's request, the INS held in abeyance the deportation proceedings, including the bail application, pending a decision in the extradition proceeding.

At a hearing before Judge John E. Sprizzo on October 12, 1983 in the Southern District of New York, Doherty's application for bail in connection with the extradition proceeding was denied. Judge Sprizzo found that Doherty presented a bail flight risk: "I would be greatly surprised, if Mr. Doherty were bailed, if he did not exercise what I would think would be a very rational judgment perhaps to disappear." At the extradition hearing on December 12, 1984, Judge Sprizzo found that Doherty had been fairly convicted in Britain. *Matter of Doherty by Gov't of United Kingdom*, 599 F.Supp. 270, 276–77 (S.D.N.Y.1984). However, Judge Sprizzo denied the British request for extradition, finding that Doherty qualified under the exception for "political offenses" under the extradition treaty as it then existed. *Id.* Accordingly, the extradition warrant was vacated. Because the denial under 18 U.S.C. § 3184 of a request for extradition is not appealable, the government filed an action for declaratory relief on February 4, 1985 in the Southern District, seeking collateral review of the district court's decision.

Formal custody of Doherty was returned to the INS pursuant to the original deportation warrant and order to show cause, although the actual place of his detention— the MCC—remained the same. Doherty renewed his bail request. On December 21, 1984, an immigration judge granted the request, setting bond at $200,000. The INS appealed the decision to the Board of Immigration Appeals ("BIA"), and received an emergency stay. On March 4, 1985, the BIA ordered that Doherty be held without bail on the ground that he presented "such a poor bail risk that no amount of bond will reasonably assure his presence for future proceedings." Doherty did not appeal the BIA decision.

On February 25, 1985, deportation hearings began before Immigration Judge Howard Cohen. At that time, the INS added six charges of deportability, supported by twelve additional factual allegations. Originally, the INS had asserted one charge supported by four allegations. In order to respond to the amendments, Doherty requested and received an adjournment of the deportation hearing until March 25, 1985.

On March 18, 1985, Doherty moved for a stay of the deportation proceedings pending resolution of the government's action for collateral review of the order denying extradition, and of two separate actions he had brought under the Freedom of Information Act in the Southern District against the INS and the Federal Bureau of Investigation. The deportation hearing was adjourned until April 15, 1985 to allow the INS to respond to the motion. The hearing was resumed on May 20 on the consent of the parties, at which time Judge Cohen stayed the deportation proceedings pending resolution of the extradition matter.

On June 25, 1985, Judge Haight dismissed the government's action for collateral review of the extradition decision because it failed to plead a claim under which relief could be granted. *United States v. Doherty*, 615 F.Supp. 755 (S.D.N.Y.1985). On March 13, 1986, we affirmed the judgment, noting that "[t]he Government has not cited, and we have not been able to find, a single case in which a declaratory judgment was used in a manner resembling that which the Government proposes here." *United States v. Doherty*, 786 F.2d 491, 500 (2d Cir.1986) *(Doherty I)*.

On September 3, 1986, Doherty asked for a resumption of the deportation proceedings and, at a conference before Judge Cohen on September 5, conceded his deportability, designating the Republic of Ireland as his chosen destination. The INS opposed Ireland as the designated destination, claiming that Doherty's deportation there would be prejudicial to the interests of the United States and arguing that he should be deported to the United Kingdom. The INS also asked for and received a continuance so that it could consult with senior government officials.

When the deportation hearing resumed on September 12, 1986, the INS argued that Doherty's deportation to Ireland would harm United States efforts to cooperate with other nations in combating terrorism. On September 19, the immigration judge rendered his decision, rejecting the government's argument and ordering that Doherty be deported to Ireland. In addition, Judge Cohen ordered that, in the event Ireland was unwilling to accept Doherty, he was to be deported to the United Kingdom. The INS appealed the order to the BIA.

On September 23, 1986, Doherty filed a habeas petition, seeking immediate deportation to Ireland. Doherty contended that the INS's appeal was frivolous and intended to delay deportation until the approval of a new extradition treaty between the United States and Great Britain, under which the political offense exception was eliminated. Two days later, Judge Leisure denied the petition. This Court affirmed, holding that the "sole cause" of the eighteen-month delay from March 18, 1985 to September 3, 1986, was Doherty's request for a stay during the pendency of the declaratory judgment action. *Doherty v. Meese*, 808 F.2d 938, 941 (2d Cir.1986) *(Doherty II)*. The Court noted that Doherty's recent acquiescence in deportation was due to impending approval of the new treaty. *Id.* at 940.

On March 11, 1987, the BIA affirmed Judge Cohen's order deporting Doherty to Ireland. After reopening the proceedings briefly because of an administrative error, the BIA reaffirmed the order in a decision dated May 22, 1987. The INS then requested that the BIA refer its decision for review by the Attorney General and, on October 28, 1987, then-Attorney General Edwin Meese, III, agreed to review the decision. At Doherty's request, Attorney General Meese extended from December 1, 1987 to January 8, 1988 the date by which Doherty was required to file a brief pertaining to the review.

On December 1, 1987, a new extradition treaty between Great Britain and Ireland became effective. On December 3, 1987, Doherty sought before the BIA to reopen the deportation proceedings in order to apply for political asylum in the United States and to withdraw his designation of Ireland as the country of deportation. Doherty contended that he should be permitted to revoke his concession to deportation because the new treaty between Ireland and Great Britain would result in his being returned to British authorities, changing the facts upon which he had based the concession. On February 7, 1988, the BIA referred that application to Attorney General Meese as well. On April 22, 1988, Doherty filed a motion for recusal of Attorney General Meese from any adjudicative role in the deportation proceedings and for remand to the BIA of the motion to reopen, contending that he could not receive a fair hearing from the Attorney General or any of his delegates because the Department of Justice for nearly five years had sought aggressively his return to the United Kingdom.

In a decision dated June 9, 1988, Attorney General Meese rejected the motion for recusal and reversed the BIA, finding that deportation to Ireland would be prejudicial to United States interests. However, the Attorney General remanded Doherty's application to reopen the deportation proceedings on the question of political asylum to the BIA for consideration. Doherty then filed with this Court a petition for review of the Attorney General's determination that deportation to Ireland was prejudicial to United States interests. That petition was held in abeyance at Doherty's request pending conclusion of the deportation proceedings.

On November 14, 1988, the BIA held that Doherty had made out a *prima facie* case that, upon his return to the United Kingdom, he would be subject to undue persecution. The BIA remanded the case to the immigration judge for a hearing to determine whether Doherty was eligible for political asylum. On December 5, 1988, the BIA granted the INS's request that the decision reopening the deportation proceedings to consider political asylum be referred to the Attorney General. On June 30, 1989, Attorney General Richard L.

Thornburgh reversed the decision of the BIA and refused to reopen the deportation proceedings. Doherty petitioned this Court for review and we consolidated the petition with Doherty's earlier petition for review of the Attorney General's order rejecting Ireland as the country of deportation. We affirmed the order rejecting deportation to Ireland, noting that Doherty's appeal was "somewhat curious at this point since [he] now, too, seeks to avoid deportation to that country." *Doherty v. United States Dep't of Justice*, 908 F.2d 1108, 1113 (2d Cir.1990) (*Doherty III*). We also held that the Attorney General abused his discretion in denying the motion to reopen on the issue of asylum. *Id.* at 1122. The Supreme Court granted certiorari on February 19, 1991 and will hear the appeal in its October, 1991 term. *INS v. Doherty*, —— U.S. ——, 111 S.Ct. 950, 112 L.Ed.2d 1039 (1991).

In May, 1989, Doherty filed an application for redetermination of bond, which the immigration judge dismissed for lack of jurisdiction. On August 9, 1989, the BIA on appeal held that the Attorney General's denial of the motion to reopen made administratively final the order to deport Doherty, divesting the BIA of jurisdiction. The BIA noted that Doherty's request for release from custody should be directed to the INS District Director. Accordingly, Doherty filed an application for bail with the District Director, who, at Doherty's request, recused himself because of his earlier involvement in the case as a trial attorney. The bond application was referred to the Associate Regional Commissioner, who denied the application on September 22, 1989. In a decision dated March 29, 1990, the BIA affirmed.

On April 20, 1990, Doherty filed this action, seeking habeas review of the BIA's decision of March 29, 1990. After hearings on the issue of the weight to be accorded the risk of Doherty's flight, the district court denied the petition in a decision dated November 5, 1990. Although finding that "there is a substantive due process right to liberty while an alien is in this country," Judge Cedarbaum rejected Doherty's contention that the prolonged length of his confinement violated this right under the three-part test of *United States v. Gonzalez Claudio*, 806 F.2d 334 (2d Cir.1986). *Doherty v. Thornburgh*, 750 F.Supp. 131, 135–37 (S.D.N.Y.1990). The district court held that the test of *Gonzales Claudio* was applicable to criminal, pre-trial detentions only and that, even if the test were applicable in the deportation context, Doherty's detention did not violate it.

## DISCUSSION

We agree with the district court's determination that, under the due process clause of the fifth amendment, aliens such as Doherty[1] possess a substantive due process right to liberty during deportation proceedings. We emphasize, however, that this is a narrow right and that judicial review of alleged interference with the right by the federal government is limited.

The fifth amendment provides, "No person shall ... be deprived of life, liberty or property, without due process of law." U.S. Const. amend. V. The term used to define those entitled to protection under the due process clause, *i.e.*, "person," does not differentiate between citizens and non-citizens, but is broad and inclusive. *See Plyler v. Doe*, 457 U.S. 202, 210–12, 102 S.Ct. 2382, 2391–92, 72 L.Ed.2d 786 (1982); *Wong Wing v. United States*, 163 U.S. 228, 237–38, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896); *cf. Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886) (equal protection clause of fourteenth amendment applies to non-citizens within territorial jurisdiction of United States).

---

**1.** The issue of the difference in rights accorded "deportable" aliens and "excludable" aliens, and the anomalies resulting therefrom, is not before us. "Aliens," as used in this opinion, refers to those such as Doherty who have "entered" the United States, as determined by the BIA. *See In re Pierre*, 14 I & N Dec. 467, 468 (1973). For a discussion of the deportable/excludable distinction, see *The Right to Recognition as a Person before the Law: The Case for Abolishing the Immigration Law Entry Doctrine,* 46 The Record of the Assoc. of the Bar of the City of New York, at 304 (April 1991) (the Comm. on Civil Rights).

It is well-settled that aliens have rights of procedural due process. *See, e.g., Wong Yang Sung v. McGrath,* 339 U.S. 33, 48–51, 70 S.Ct. 445, 453–55, 94 L.Ed. 616 (1950); *The Japanese Immigrant Case,* 189 U.S. 86, 100–01, 23 S.Ct. 611, 614–15, 47 L.Ed. 721 (1903); 8 U.S.C. § 1252(b). These protections extend even to aliens, such as Doherty, "whose presence in this country is unlawful." *Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976). However, Doherty does not argue that the process under which he was denied bail was unfair or inadequate, but rather, that the very fact that he has been subjected to prolonged detention without bail violates his substantive right to liberty. The government responds by arguing that, as an alien, Doherty has no such substantive right.

■ In the context of pre-deportation detention, the fifth amendment cannot be interpreted as denying aliens substantive due process rights while, at the same time, affording them procedural due process rights. It would make little sense to interpret the fifth amendment as permitting the deprivation of an alien's liberty by the government in a manner that "shocks the conscience," *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952); *see also Palko v. Connecticut,* 302 U.S. 319, 328, 58 S.Ct. 149, 153, 82 L.Ed. 288 (1937), with the single constraint that adequate procedural safeguards be provided before subjecting the alien to such treatment. Although the Supreme Court has questioned the extent to which aliens possess substantive rights under the due process clause, *see, e.g., Galvan v. Press,* 347 U.S. 522, 530–31, 74 S.Ct. 737, 742–43, 98 L.Ed. 911 (1954); *Harisiades v. Shaughnessy,* 342 U.S. 580, 588–90, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952), it never has held flatly that no such rights exist. We think that aliens do have a substantive due process right to be free of arbitrary confinement pending deportation proceedings.

■ It is axiomatic, however, that an alien's right to be at liberty during the course of deportation proceedings is circumscribed by considerations of the national interest. Control over matters of immigration and naturalization is the "inherent and inalienable right of every sovereign and independent nation." *Fong Yue Ting v. United States,* 149 U.S. 698, 711, 13 S.Ct. 1016, 1021, 37 L.Ed. 905 (1893); *see Carlson v. Landon,* 342 U.S. 524, 534, 72 S.Ct. 525, 531, 96 L.Ed. 547 (1952). Under the United States Constitution, such control is vested in the political branches of government. *See* U.S. Const. art. I, § 8, cl. 4; *Mathews,* 426 U.S. at 81–82, 96 S.Ct. at 1892–93. Congressional power in this area is plenary, subject to only limited judicial review. *See Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977); *Hampton v. Mow Sun Wong,* 426 U.S. 88, 101–02 n. 21, 96 S.Ct. 1895, 1904–05 n. 21, 48 L.Ed.2d 495 (1976); *Azizi v. Thornburgh,* 908 F.2d 1130, 1133 (2d Cir. 1990). In exercising its broad power over immigration and naturalization, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews,* 426 U.S. at 80, 96 S.Ct. at 1891. Governmental conduct that may be considered "shocking" when it serves to deprive the life, liberty or property of a citizen may not be unconstitutional when directed at an alien.

■ Doherty relies on *United States v. Gonzales Claudio,* 806 F.2d 334, 339 (2d Cir.1986) and its progeny, to support his contention that inordinately long pre-deportation detention is unconstitutional. In *Gonzales Claudio,* we analyzed the constitutionality of prolonged detention without bail pending a criminal trial by examining three factors: the length of detention, the extent to which the prosecution bears responsibility for pre-trial delay and the risk of flight by the defendant. *Id.* at 340–43; *see also United States v. Melendez–Carrion,* 820 F.2d 56, 59 (2d Cir.1987); *United States v. Ojeda Rios,* 846 F.2d 167, 169 (2d Cir.1988) (per curiam). Doherty's reliance is misplaced because, in *Dor v. District Director, INS,* 891 F.2d 997, 1003 (2d Cir. 1989), we held that *Gonzales Claudio* did not control the determination of the constitutionality of prolonged detention pending deportation. The holding in *Dor* was bot-

tomed on the distinctions between deportation and criminal proceedings.

"[T]he full trappings of legal protections that are accorded to criminal defendants are not necessarily constitutionally required in deportation proceedings." *Dor*, 891 F.2d at 1003; *see also INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038–39, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984). As the district court noted, unlike a criminal defendant, Doherty does not enjoy a presumption of "innocence," or an express constitutional and statutory right to a speedy proceeding. *Doherty*, 750 F.Supp. at 136. Although Congress has provided for the possibility of bonded release of an alien during deportation proceedings, bail is permitted at the discretion of the Attorney General, *see* 8 U.S.C. § 1252(a) & (c). By contrast, the statute authorizing pretrial detention contains numerous guidelines which must be satisfied before an order can be issued, *see* 18 U.S.C. § 3142(e) & (g). Clearly, Doherty's liberty right is significantly more qualified than that of a criminal defendant. *See United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 154–55, 44 S.Ct. 54, 56, 68 L.Ed. 221 (1923) (involuntary confessions admissible at deportation hearing); *Galvan*, 347 U.S. at 531, 74 S.Ct. at 742 (*ex post facto* clause does not apply to deportation proceedings).

Doherty argues that *Dor* is not dispositive because there the court in fact applied the *Gonzales Claudio* test to a deportation case and merely found no constitutional violation based on the facts before it. It is true that, in reaching their decisions, both the court in *Dor* and the district court in the case at bar examined the *Gonzales Claudio* factors. *See Dor*, 891 F.2d at 1003; *Doherty*, 750 F.Supp. at 137–39. Nonetheless, the distinction between criminal and deportation proceedings was the primary rationale in both *Dor* and the district court decision for holding that *Gonzales Claudio* was inapposite, and the application of the *Gonzales Claudio* test served only as a point of reference.

In any event, because of the contrasts between the rights of criminal defendants and aliens, we believe a different focus must govern the determination of constitutionality of pre-deportation detention. The governmental conduct Doherty complains of—more than eight years of detention without bail—results from a decision of the Attorney General, made through his delegates. The statute governing parole for deportable aliens provides that an alien arrested under an immigration warrant and "taken into custody may, in the discretion of the Attorney General and pending ... final determination of deportability, (A) be continued in custody; or (B) be released under bond ...; or (C) be released on conditional parole." 8 U.S.C. § 1252(a)(1). Following a final determination of deportability, such as occurred here on June 30, 1989, "at the Attorney General's discretion, the alien may be detained [or] released on bond," for the six month period, excluding judicial review, in which the deportation must be effected. 8 U.S.C. § 1252(c). The Attorney General has delegated the exercise of these statutory powers to the INS, *see* 8 C.F.R. § 2.1, subject to review by the BIA, *see id.* § 3.1(d). The Attorney General retains authority to review all INS and BIA decisions. *Id.* §§ 2.1, 3.1(h). Because Congress has vested the Attorney General with this broad discretion, *see United States ex rel. Barbour v. District Director of INS*, 491 F.2d 573, 577–78 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974), in assessing the constitutional validity of Doherty's detention, we must focus on the decision of that official to deny bail.

Under section 1252(c), habeas relief from the denial of bail is proper if the Attorney General fails to deport the alien within six months after the final order of deportation, excluding any judicial review, or "upon a conclusive showing ... that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances." Habeas relief for the Attorney General's failure to proceed with "reasonable dispatch" is also available before a final order has been issued. *See* 8 U.S.C. § 1252(a)(1). None of these statutory grounds appear available to Doherty. The first ground is not available because judicial review of the

Attorney General's refusal to reopen the proceedings, which made final the deportation order, is not complete. Doherty already has presented the "reasonable dispatch" ground for habeas relief, which we rejected, *see Doherty II*, 808 F.2d at 942, and we have been presented with no conclusive evidence of any unreasonable delay occurring since that decision. In any event, Doherty's petition is not based on these statutory grounds, but rather, he seeks habeas relief premised solely on the contention that his lengthy detention violates the fifth amendment.

Because the infringement upon Doherty's liberty interest results from a proper exercise of discretion, we hold that the prolonged detention in this case is not conduct that goes beyond the range of government activity permitted by the Constitution. Undoubtedly, the government wants Doherty returned to Great Britain. The primary purpose of detention under section 1252 is to ensure that the alien will be available if he or she is determined to be deportable, as has occurred here. *Wong Wing*, 163 U.S. at 235, 16 S.Ct. at 980; *Flores v. Meese*, 934 F.2d 991, 1002 (9th Cir.1990); *Leader v. Blackman*, 744 F.Supp. 500, 507 (S.D.N.Y.1990). Detention of Doherty is not an end in itself sought by the Attorney General; rather, bail has been denied in order to preserve the government's ability to later carry out its broader responsibilities over immigration matters.

We do not perceive any invidious purpose or bad faith motivating the denial of bail. The consistent administrative and judicial findings that Doherty presents an exceptionally poor bail risk support the continuing decision to detain him. *Cf. Rubinstein v. Brownell*, 206 F.2d 449, 456 (D.C.Cir. 1953) (revocation of bail after final deportation order and pending judicial review improper where "no suggestion that [detainee] will flee or hide"), *aff'd*, 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421 (1954). Although Doherty does not appear to pose any direct threat to individual citizens, we already have noted that, due to his PIRA affiliation, he may constitute a more general

threat to national security, *see Doherty v. United States Dep't of Justice*, 775 F.2d 49, 52 n. 5 (2d Cir.1985), which is also a proper basis for detention, *see Carlson*, 342 U.S. at 541–42, 72 S.Ct. at 534–35. We believe that these considerations provide a valid basis for the continuing denial of bail under section 1252, notwithstanding the unusually long detention that has resulted.

An examination of the causes of the length of this litigation and, consequently, of Doherty's detention, supports our conclusion. Over the course of the last eight years, Doherty has exercised skillfully his rights under the deportation statute, delaying and perhaps preventing the outcome sought by the government. He has resisted deportation when it would result in his return to Great Britain, agreed to deportation when it would not result in his return, and then resumed his resistance to deportation when circumstances changed. Only in the face of the impending elimination of the political offense exception did Doherty seek to expedite the deportation process and, when it appeared that his destination of choice no longer offered a haven from extradition, he sought relief from deportation, once again slowing down the process. Although this litigation strategy is perfectly permissible, we hold that Doherty may not rely on the extra time resulting therefrom to claim that his prolonged detention violates substantive due process. *See INS v. Rios–Pineda*, 471 U.S. 444, 450, 105 S.Ct. 2098, 2102, 85 L.Ed.2d 452 (1985) ("[t]he purpose of an appeal [from a] ... determination of deportability ... is not to permit an indefinite stalling of physical departure in the hope of eventually satisfying legal prerequisites"); *Dor*, 891 F.2d at 1002–03; *United States ex rel. Cefalu v. Shaughnessy*, 117 F.Supp. 473, 474 (S.D.N.Y.), *aff'd on opinion below*, 209 F.2d 959 (2d Cir. 1954) (per curiam).

It is true that, during the course of Doherty's detention, "[t]he government's use of administrative and judicial processes has been exhaustive, to say the least." *Doherty III*, 908 F.2d at 1122. Were Doherty's lengthy detention largely the result of a government strategy intended to delay, we might find a due process violation. Yet, in

*Doherty II,* we concluded that Doherty's tactical choices were the "sole cause" of eighteen months of the delay that had occurred at the time of that decision. 808 F.2d at 941. More recently, the BIA found in its March 29, 1990 decision that "a substantial portion of [Doherty's] detention can fairly be attributed to him." Finally, we agree with the district court's finding that "[t]he interruption in [Doherty's] applications for relief from deportation resulting from his change in strategy lasted from the withdrawal of his applications in September of 1986 to the Second Circuit's decision reopening the deportation proceedings in June of 1990," and the government's opposition to the motion to reopen, although unsuccessful, was not frivolous or intended to cause delay. *Doherty,* 750 F.Supp. at 138. We add that, because of the grant of the government's petition for a writ of certiorari since the district court's decision, the interruption continues.

Moreover, from the outset of his detention, Doherty has possessed, in effect, the key that unlocks his prison cell. That is, if Doherty had agreed to deportation in the first place, he would not have been detained at MCC for the past eight years. The fifth amendment requires that Doherty be provided adequate procedural safeguards during the course of the deportation proceedings and that, absent a proper exercise of statutory discretion by the Attorney General, he not be detained pending deportation. However, Doherty has "no substantive due process right not to be deported." *Linnas v. INS,* 790 F.2d 1024, 1031 (2d Cir.), *cert. denied,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986). Because deportation was less attractive to him than his present course and because he has availed himself of the statutory mechanisms provided for aliens facing deportation, Doherty is subject to the countervailing measures Congress has enacted to ensure the protection of national interests. *Cf. Chaffin v. Stynchcombe,* 412 U.S. 17, 30–32, 93 S.Ct. 1977, 1984–86, 36 L.Ed.2d 714 (1973). It cannot be said that, by attributing to Doherty primary responsibility for the delay in resolving his status, he is being "punished" for the exercise of his constitutional rights. Doherty certainly has been afforded the full panoply of procedural due process. He has not demonstrated the invidious purpose, bad faith or arbitrariness necessary to make out a denial of substantive due process.

## CONCLUSION

The judgment of the district court denying Doherty's petition is affirmed.

ALTIMARI, Circuit Judge, dissenting:

For the past 200 years we have struggled and anguished over the concept of due process. There is general unanimity among judges as to when the Due Process Clause of the fifth amendment is violated and when it is not. However, there are also some cases that tax our minds and result in reasoned disagreement. This is such a case. Today, the majority holds that because Doherty's detention results from "a proper exercise of [the Attorney General's] discretion," Doherty's fifth amendment right to due process has not been violated. Because I cannot agree with this conclusion, I must respectfully dissent.

During the past eight years, Doherty—who has never been charged with any crime in the United States—has been incarcerated at the Metropolitan Correctional Center in New York City. He has remained incarcerated while a seemingly endless series of proceedings and appeals have been conducted to determine whether and to where Doherty should be deported.

Upon Doherty's arrest in 1983, the government initiated both deportation and extradition proceedings against him. At Doherty's request, the government stayed the deportation proceedings until the matter of his extradition was concluded. In December 1984, a district judge hearing the extradition matter determined that the crimes for which Great Britain sought Doherty's extradition were "political offenses" within the meaning of the extradition treaty between the United States and Great Britain and were therefore non-extraditable offenses. Accordingly, Great

Britain's extradition request was denied. Although decisions regarding extradition are non-appealable, the government, in an attempt to overturn this decision, filed a motion for a declaratory judgment of extradition. While it was surely legal for the government to file such a motion, a declaratory judgment had never before been used to contest an extradition decision. This motion was ultimately denied by both a district judge and this Court. In some respect, the government's declaratory judgment motion embodied the general litigation posture that the government assumed in this case—once dissatisfied with the result of a decision in Doherty's favor, the government attempted to use an extraordinary, but legitimate, tool to obtain the result it was seeking.

After the declaratory judgment motion was denied, deportation proceedings were subsequently reopened. Seeking to end his confinement, Doherty requested that he be deported to the Republic of Ireland pursuant to 8 U.S.C. § 1253(a). In response, the government contested Doherty's choice of the Republic of Ireland, claiming that deportation to any destination other than Great Britain would be prejudicial to American interests. Taking this general stance, the government appealed a number of decisions which would have allowed Doherty to be deported to the Republic of Ireland. For example, after the Board of Immigration Appeals issued its final decision that Doherty could be deported to the Republic of Ireland, the government exercised its right to appeal this decision to the Attorney General—such an appeal is almost never taken. Once again, the government went to extraordinary lengths to preclude Doherty from being deported to the country of his choice. While I do not intend to suggest that the government's actions were the sole cause of Doherty's extended confinement—indeed Doherty can also be described as litigious—or that the government does not have a right to pursue its appeals to the highest level—as does Doherty—it does appear that in this case the government has engaged in protracted litigation in an attempt to achieve through deportation what it could not through extradition—Doherty's return to Great Britain.

To my mind, Doherty's case presents the archetypical situation that the Due Process Clause was designed to protect against.

> [T]he Due Process Clause embodies a system of rights based on moral principles so deeply embedded in the traditions and feelings of our people as to be deemed fundamental to a civilized society as conceived by our whole history. Due process is that which comports with the deepest notions of what is fair and right and just.

*Solesbee v. Balkom,* 339 U.S. 9, 16, 70 S.Ct. 457, 461, 94 L.Ed. 604 (1950) (Frankfurter, J., dissenting). It is fundamental to our conception of liberty that an individual who is not accused or convicted of a crime in this country may not be held indefinitely by the State, regardless of his or her immigration status. According to the majority opinion, however, Doherty may be confined until the State has exhausted all legitimate grounds for appeal. Allowing Doherty's incarceration to continue until all litigation surrounding the deportation is concluded could theoretically result in his continued confinement for ten, twenty, or thirty years—or even the rest of his natural life. This result is unjustifiable, notwithstanding Doherty's status as an alien.

I cannot accept the majority's conclusion that, in the context of this case, "[g]overnmental conduct that may be considered 'shocking' when it serves to deprive the life, liberty or property of a citizen may not be unconstitutional when directed at an alien." I *do* find it shocking that we would allow the government to indefinitely pursue a litigation strategy, which was essentially designed to circumvent an extradition decision, at the expense of an individual's right to liberty. At some time, the government's legitimate appeals impinge on the individual's rights to such an extent that the Due Process Clause requires us to say to the State—enough is enough—"Thou shalt not." *See Id.* at 21, 70 S.Ct. at 463 (Frankfurter, J., dissenting); *County of Riverside v. McLaughlin,* —— U.S. ——, 111 S.Ct. 1661, 1675, 114 L.Ed.2d 49 (1991)

(Scalia, J., dissenting) ("[a]t some point, legitimate reasons for delay become illegitimate."); cf. *United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir.1986) ("at some point the length of confinement [itself] would exceed constitutional limits regardless of the circumstances."). I believe we have reached that moment.

There seems to me to be a parallel between the rights exercised by the government and the rights exercised by Doherty. Theoretically, parallel lines never meet; however when dealing with so esoteric a concept as due process they sometimes do. In an imperceptible way they have merged. Both the government and Doherty point an accusing finger at the other as they assess blame for the length of Doherty's incarceration. After eight years, the parallel rights so freely granted have become so intertwined that we are unable to conclude whether one party or another is responsible for the extended confinement. This cannot mean, however, that so long as the parties in the context of this case assert their respective rights in good faith—which necessarily results in delay—the initial detention may be continued ad infinitum. We are now in a position to determine that that which was once acceptable (the detention of Doherty) ought not to be tolerated, continued or countenanced.

The government nonetheless argues, and the majority seems to agree, that there is a marked difference between a civil and a criminal detention. They should be reminded of Cervantes' admonition that it really does not make too much difference whether the rock hits the pitcher or the pitcher hits the rock—the pitcher breaks, and whether or not it is a civil confinement or a criminal confinement, it is in the end a confinement and a denial of personal liberty. Similarly, the majority spends considerable time differentiating between the procedural and substantive due process to which Doherty is entitled. In my opinion, so fundamental a right has been transgressed that it is not necessary to write separately about the distinction between procedural and substantive due process—if indeed such a distinction exists.

A point is reached when all pedagogical distinctions give way to common sense and reason and we say: enough—it is just flat out wrong to confine an individual for eight years when he has not been charged with a crime in this country and has been declared by a court of competent jurisdiction to be guilty of a "political offense."

It is a bitter irony that in this era in which totalitarian regimes are adopting the language of freedom and looking to the United States as a model of liberty and justice, we today find it acceptable that a man who has not been charged with a crime in this country may remain incarcerated here indefinitely. I have always believed that a major difference between our Constitution and those that speak of justice in bold terms, but fail to provide it in reality, is that our Constitution provides for a judicial branch that is charged with the task of safeguarding individuals' rights, be they citizens or not. Concededly, there is a difference between the rights of citizens as compared to those of non-citizens. The facts of this case, however, clearly transcend these differences. Ultimately, it is judges who must give substantive content to the meaning of the Constitution. Thus, I cannot in good conscience sit idly by and allow the Due Process Clause to become mere words. Because I believe that the Due Process Clause will not permit an indefinite confinement, or even the confinement for eight years, of an individual who has not been criminally charged and is merely awaiting deportation, I would reverse the judgment of the district court and remand with instructions to the court to set appropriate bail.