**Angela Maria Teixeira CARDOSO, Petitioner**

v.

**Janet RENO, Attorney General, U.S. Immigration and Naturalization Service, Steven Farquharson, District Director, and Gary Cotê, Officer in Charge, Respondents.**

**No. 3:00CV2163(JBA).**

United States District Court, D. Connecticut.

Jan. 22, 2001.

Michael J. Boyle, North Haven, CT, for Petitioner.

James K. Filan, Jr., U.S. Attorney's Office, New Haven, CT, for Respondents.

## MEMORANDUM OF DECISION

ARTERTON, District Judge.

Petitioner Angela Cardoso ("Cardoso") seeks a writ of habeas corpus ordering the Immigration and Naturalization Service to conduct a bail hearing, alleging that her continued detention pending a final order of deportation pursuant to 8 U.S.C. § 1226(c) (INA § 236(c)) is violative of her Fifth Amendment rights to substantive and procedural due process. This case requires the Court to assess the constitutionality of a section of the immigration laws mandating detention of deportable aliens, even lawful permanent residents like Ms. Cardoso, pending a final order of deportation, without assessment of that alien's flight risk or potential for endangering the community. Numerous courts across the country have considered constitutional challenges to this mandatory detention provision, and have split on both the final issue of the statute's constitutional validity as well as the method of analysis. For the reasons that follow, this Court finds § 236(c) unconstitutional as applied to petitioner, and grants the petition.

## I. Factual Background

In brief, petitioner is a native of Cape Verde who left that country along with her family when it was granted independence from Portugal, and immigrated to this country at the age of 9. She has lived in Waterbury, Connecticut, since that time, and has two minor U.S. citizen sons, ages 7 and 13. Her mother and three siblings are U.S. citizens, and her grandmother and stepfather are permanent residents. Ms. Cardoso was addicted to drugs, and in 1996, 1997, and 1998 had multiple convic-

tions for larceny in the sixth degree (Conn. Gen.Stat. § 53a–125b), as well as convictions for issuing a bad check, failure to appear, breach of the peace, and escape (when she walked away from a community/home-based drug-rehabilitation program). *See* Pet. Ex. B (list of convictions). According to petitioner's brief she has come to terms with her drug problem through a treatment program she completed while incarcerated, and has completed progressive levels of drug rehabilitation as well as a number of educational and social readjustment programs, including achieving her GED and completing a nurses' aide training program. She was taken into INS custody upon completion of her state sentence on Sept. 28, 2000, and has been detained by the INS at the York Correctional Institute in Niantic, Connecticut, since that time. The Board of Immigration Appeals (BIA) found her eligible for cancellation of removal under INA § 240A after the conviction on which "aggravated felon" status was based, was vacated by the state court, and a hearing on this discretionary relief, which could permit her to remain here as a permanent legal resident, is scheduled for January 24, 2000.

## II. *Statutory Provisions at Issue*

Cancellation of Removal, INA § 240A(a), 8 U.S.C. § 1129b(a), replaces what was known as "Section 212(c) relief" under the previous immigration laws, and grants the Attorney General discretion to permit long-term permanent resident aliens with less serious criminal convictions to retain their permanent residence. Factors considered by the Immigration Judge (IJ) in deciding a § 240A application include the petitioner's family ties, length of residence and employment in the U.S., evidence of rehabilitation and criminal record, and other evidence of bad character or immigration violations. Under the immigration laws extant before 1996, a bond hearing was allowed to determine whether a deportable alien should be detained pending a final deportation order, including the completion of any proceedings re-

lated to discretionary relief. Congress then passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–298, which significantly altered the landscape of the immigration laws by making more offenses deportable offenses, and streamlining the process for deportation. Section 236(c) of the IIRIRA provides that:

(1) The Attorney General shall take into custody any alien who—... (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii) [multiple crimes of moral turpitude], (A)(iii) ["Aggravated felony"], (B) ["Controlled substances"], (C) ["Certain firearm offenses"], or (D) ["espionage-related crimes"] of this title, ...

(2) Release—The Attorney General may release an alien described in paragraph (1) *only if* the [alien has been admitted into the Witness Protection Program], ... and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding.

8 U.S.C. § 1226(c) (emphasis added).

It is undisputed that Ms. Cardoso does not fall into the limited exception for participants in the Witness Protection Program, and therefore she has been held in custody since September 28, 2000 under the authority of § 236(c). As characterized by the INS, the mandatory detention provision applies an irrebuttable presumption that deportable aliens are either dangers to the community or flight risks, and the presumption is eminently reasonable as applied to the petitioner. Resp. Mem. in Opp. at 21. Petitioner asserts that her continued detention solely on the basis of this statutory presumption infringes her fundamental liberty right, and as a consequence, jeopardizes her chances of success at her § 240A hearing, as she is unable to adequately demonstrate the accuracy of her claim of rehabilitation without release into the community.

III. *Analysis*

"It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 307, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). "[O]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly." *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). Petitioner claims that the mandatory detention provision violates both the substantive and procedural components of the Fifth Amendment's Due Process clause, the procedural due process requirement of which prohibits the government from depriving an individual of life, liberty or property in an unfair manner, *see Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and the substantive due process component of which precludes the government from engaging in conduct that "shocks the conscience," *see Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), or interferes with rights "implicit in the concept of ordered liberty," *see Palko v. Connecticut*, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937). Substantive due process protects an alien from governmental infringement upon certain "fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).

A. *Substantive Due Process*

Petitioner argues that a fundamental liberty interest is implicated by this statute, and that accordingly the Court should apply a strict scrutiny analysis, and require the infringement on a fundamental interest to be narrowly tailored to serve a compelling governmental interest. Pet. Mem. at 10. More particularly, the petitioner urges this Court to utilize the "excessiveness" test of *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), which is predicated upon the fundamental nature of the right to liberty. 481 U.S. at 750, 107 S.Ct. 2095. In support of her contention, petitioner relies on *Doherty v. Thornburgh*, 943 F.2d 204 (2d Cir. 1991), in which the Second Circuit held that aliens who have entered this country, even illegally, possess a substantive due process right to liberty during deportation proceedings. "We think that aliens do have a substantive due process right to be free from arbitrary confinement pending deportation proceedings." *Id.*, 943 F.2d at 208–09. The *Doherty* court emphasized, however, that "this is a narrow right and that judicial review of alleged interference with the right by the federal government is limited." *Id.* at 208. Further, the Supreme Court has admonished federal courts that a due process analysis must always "begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Flores*, 507 U.S. at 302, 113 S.Ct. 1439 (internal citations omitted). The Court must therefore determine whether the right asserted here—a deportable alien's right to not be detained without opportunity to demonstrate that she is neither a danger to the community nor a risk to abscond pending a hearing on discretionary relief, in rebuttal of the presumption in the statute to the contrary—is a fundamental liberty interest, in order to determine the appropriate standard of scrutiny.

A number of district courts examining the constitutionality of § 236(c) have applied the strict scrutiny and/or the *Salerno* test, either explicitly or implicitly concluding that the liberty interest at issue here is fundamental. *See, e.g., Zgombic v. Farquharson*, 89 F.Supp.2d 220, 234 (D.Conn. 2000) (applying compelling interests test because the right to freedom from bodily restraint is "the simplest example of [a fundamental] right"); *Danh v. Demore*, 59 F.Supp.2d 994, 1000 (N.D.Cal.1999) *quoting Wong Wing v. United States*, 163 U.S.

228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896) ("all persons within the territory of the United States are entitled to the protection guaranteed by [the Fifth and Sixth] amendments," ); *Martinez v. Greene,* 28 F.Supp.2d 1275 (D.Colo.1998); *Bouayad v. Holmes,* 74 F.Supp.2d 471 (E.D.Pa.1999) (citing to the Supreme Court's statement in *Foucha v. Louisiana* that "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause"), *citing Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992); *Small v. Reno,* 127 F.Supp.2d 305 (D.Conn.2000), Ruling on Petition for Habeas Corpus dated Dec. 29, 2000 (lawful permanent resident whose application for discretionary relief was pending had fundamental liberty interest in an individualized bond determination).

Other district courts considering the validity of § 236(c) have found that the right to an individualized determination of flight risk or danger before being detained pending a final order of deportation is not fundamental. *See, e.g., Sierra–Tapia v. Reno,* No. 99–cv–986, 1999 WL 803898 (S.D.Cal. Sept. 30, 1999) (because petitioner not eligible for discretionary relief and would most likely be removed from the country, liberty interest not fundamental); *Reyes v. Underdown,* 73 F.Supp.2d 653 (W.D.La.1999); *Diaz–Zaldierna v. Fasano,* 43 F.Supp.2d 1114, 1118 (S.D.Cal.1999). The only Court of Appeals that has confronted this issue squarely, the Seventh Circuit, upheld § 236(c) on the grounds that a fundamental liberty interest was not implicated, where the petitioner was not eligible for any forms of discretionary relief and thus not entitled to remain in this country, although he could be at liberty in his native land. *See Parra v. Perryman,* 172 F.3d 954, 958 (7th Cir.1999).

■ After consideration of the diverse reasoning in the relevant case law and the parties' briefings and oral argument on the issue, the Court concludes that detaining Ms. Cardoso without allowing her a forum to demonstrate that the statutory presumption of dangerousness and flight risk is inapplicable to her implicates a fundamental liberty interest. As the Supreme Court has noted, freedom from restraint is one of "those fundamental rights and liberties, which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). Ms. Cardoso is a lawful permanent resident of this country who has not received an administratively final order of deportation; rather, she has the opportunity to demonstrate that clemency is warranted due to her family ties to this country and her alleged rehabilitation. While the government correctly points out that *Doherty* emphasized the narrow and limited nature of substantive due process rights held by aliens, the Court views that statement as a limitation on the circumstances in which such a right exists, not a shading on the extent or scope of that right once it is found to exist. As noted by the BIA itself, "[a] lawful permanent resident who commits a removable or deportable offense remains a lawful permanent resident until an administratively final order of removal or deportation deprives him of that status." *In re Mendoza–Sandino,* Interim Dec. 3426, 2000 WL 225840 (BIA 2000). Ms. Cardoso therefore retains whatever constitutionally-protected liberty interests flow from her status as a lawful permanent resident, which includes the substantive due process right to be free of arbitrary confinement pending the completion of deportation proceedings. *Doherty,* 943 F.2d at 209.

The Court thus rejects the government's contention that the liberty interest at issue in this case is less than fundamental. First, the government's argument misconstrues the nature of the deference this Court must accord Congressional decisions on immigration matters. *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), which employed the "facially legitimate and bona fide reason" standard, did

not involve detention or bodily restraint such as are at issue here, and which implicate quintessential notions of liberty. Rather, *Fiallo* articulated the deference to be given by federal courts to Congress' policy determination that natural mothers, not unwed natural fathers, should get the special preference immigration status accorded the child or parent of a U.S. citizen. In reaching the conclusion that this statutory preference violated no constitutional provisions the Supreme Court noted that it had "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Id.* at 791, 97 S.Ct. 1473. The case did not, however, address the means by which the government implemented this sovereign power, which is the focus of the challenge in the present case. *See INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) ("The plenary authority of Congress over aliens ... is not open to question, but what is challenged here is whether Congress has chosen a constitutionally permissible means of implementing that power...."); *see also Welch v. Reno,* 101 F.Supp.2d 347, 354 (D.Md.2000) ("A distinction must be made between Congress' power over substantive immigration laws and its power to legislate rules implementing those laws.").

Second, the Court is unpersuaded that the "reasonable fit" standard of review articulated in *Flores* is appropriately applied to a statute that mandates indefinite detention of a lawful permanent resident alien who still possesses the right to consideration for continued permanent residence, despite having committed a deportable offense. *Flores* was brought as a facial challenge to a statute requiring the detention of juvenile aliens in state-run institutions prior to a determination of their deportability, denying them release into the custody of non-guardian strangers. The *Flores* Court distinguished this situation from cases asserting deprivations of "fundamental" liberty interests such a "freedom from physical restraint ... in

the sense of ... a barred cell." 507 U.S. at 302, 113 S.Ct. 1439. The reasoning of the opinion in *Flores* flowed from the "novelty" of the right asserted in that case— "the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution"—and the recognized fact that "juveniles, unlike adults, are always in some form of custody." 507 U.S. at 302, 303, 113 S.Ct. 1439. In contrast, Ms. Cardoso, an adult lawful permanent resident of this country, asserts the most basic of the fundamental rights: the right to be free of arbitrary confinement,—"arbitrary" being defined as "without consideration and regard for facts and circumstances." Black's Law Dictionary 104 (6th Ed.1991). Indeed, Justice O'Connor's concurrence makes clear the distinction between the *Flores* juveniles and Ms. Cardoso:

> A person's core liberty interest is also implicated when she is confined in a prison, a mental hospital, or some other form of custodial institution, even if the conditions of confinement are liberal. This is clear beyond cavil, at least where adults are concerned .... The institutionalization of an adult by the government triggers heightened, substantive due process scrutiny.

*Id.,* 507 U.S. at 315, 113 S.Ct. 1439 (O'Connor, J., concurring). Accordingly, *Flores* does not require the application of a lower standard of review in this case.

The Court also declines to accept the government's argument that this statutory mandatory detention passes constitutional muster because Ms. Cardoso has the metaphorical keys to her own release. Utilization of this supposed "key" would require Ms. Cardoso to submit to deportation, thus relinquishing the very right she is entitled to advance—to pursue her application for continued permanent residence in this

country. *See, e.g. Small,* Ruling at 34. *But see Parra v. Perryman,* 172 F.3d at 957; *Doherty,* 943 F.2d at 212 (fact that alien could be released if he agreed to deportation is relevant to constitutional analysis). The alien in *Parra* had been convicted of an aggravated felony, and thus his removal was "overwhelmingly likely"; the Seventh Circuit noted that his brief did not "even hint at a substantive argument that he is entitled to remain in the United States." *Id.* at 956. The question was then simply where Parra "passe[d] the time while waiting for the order to become final." *Id.* In *Doherty,* the issue was the constitutional validity of eight years of detention without release on bail pending deportation, under a statutory regime that allowed release on bail at the discretion of the Attorney General. 943 F.2d at 208. The Second Circuit concluded that the decision to deny bail for eight years did not violate substantive due process because he presented "an exceptionally poor bail risk," and attributed to Doherty himself the primary responsibility for the length of his detention. Although the *Doherty* court utilized the "keys to his own cell" metaphor, it did so only in the context of an illegal alien, who would not have been held in such lengthy detention absent his own efforts to forestall his inevitable deportation out of this country. 943 F.2d at 212.

In the present case, deeming Ms. Cardoso to have the keys to her own cell would be, in effect, requiring her to relinquish her statutory eligibility to apply for cancellation of removal, with the result that a formal deportation order would issue and she would be forced to either leave behind her U.S. citizen children, or require them to leave their homeland and accompany her to a foreign land. While such a choice may be Ms. Cardoso's lot if she is denied cancellation of removal, the Court declines to attach any constitutional significance to the fact that Ms. Cardoso could end her mandatory detention if she abandoned her claim to § 240A relief, and moved to the

final order stage where, ironically, release is available. *See* 8 U.S.C. § 1231(a)(3).

Because Ms. Cardoso still might avoid deportation by prevailing at her § 240A hearing, her case is distinguishable from those involving aliens who are virtually certain to be deported such that § 236(c) was held not to infringe any fundamental rights. *See Parra,* 172 F.3d at 958; *Avramenkov v. INS,* 99 F.Supp.2d 210, 216 (D.Conn.2000) (finding no significant liberty interest implicated by continued detention where statute eliminated § 212(c) relief for offense and "[p]etitioner is almost certainly going to be removed from the country"); *Reyes,* 73 F.Supp.2d at 658 (petitioner statutorily ineligible for relief from removal).

The government argues that Ms. Cardoso's likelihood of success at her hearing is remote, given the nature of her convictions and her false responses to questions on her Application for Naturalization. *See* Resp. Mem. at 16–17. While the fact that discretionary relief is available does bear on the determination of the nature of the right at issue, *see Szeto v. Reno,* 2000 WL 630869 (N.D.Cal. May 5, 2000) (because petitioner had "non-frivolous argument that he will ultimately prevail on his claim that he should not be removed," mandatory detention violated fundamental right to liberty), the potential outcome of a § 240A application does not. Such an approach, in this Court's view, conflates two different questions, and collapses an alien's constitutional claim to be free of unreviewed mandatory detention pending deportation into a determination of the merits of the removal proceedings against him or her. The nature of the liberty interest affected by § 236(c) is not the substantive right to remain in this country, but rather Ms. Cardoso's right to rebut the purpose for her automatic detention while the ultimate question of her removability is being decided. *See Bouayad,* 74 F.Supp.2d at 475.

The liberty interest in non-arbitrary detention which Ms. Cardoso seeks to protect is relatively modest: she is not

claiming a fundamental liberty interest to remain in this country or even a fundamental liberty interest in being released on bail. Rather, she simply seeks the opportunity to demonstrate that the statutory presumption of community danger or flight risk is arbitrary as applied to her. *See Danh*, 59 F.Supp.2d at 1003. Because only the means of implementing Congress' sovereign power to admit or exclude aliens is at issue here, and petitioner may be eligible to retain her permanent resident status, the Court accordingly rejects the government's exhortation to utilize a lower standard than strict scrutiny in assessing § 236(c)'s constitutionality.

Having found that Ms. Cardoso has a fundamental right to not be detained without some individualized determination of her flight risk and dangerousness pending the outcome of her § 240A hearing, which is not provided by the mandatory detention requirement of § 236(c), the Court next considers whether such infringement is sufficiently narrowly tailored to compelling governmental purposes by employing the *Salerno* analysis. That test asks whether the statute is regulatory, rather than punitive, and whether it appears excessive in relation to the purpose behind the statute. *Salerno*, 481 U.S. at 747, 107 S.Ct. 2095. *See Martinez*, 28 F.Supp.2d at 1281; *Danh*, 59 F.Supp.2d at 999; *Van Eeton*, 49 F.Supp.2d at 1190; *Small*, Ruling at 24–25.

Because the power to deport necessarily includes the power to detain, at least for some period of time, like the Bail Reform Act analyzed in *Salerno*, the detention mandated by § 236(c) is clearly regulatory and not punitive in nature. *See Carlson v. Landon*, 342 U.S. 524, 537, 72 S.Ct. 525, 96 L.Ed. 547 (1952) ("Deportation is not a criminal proceeding and has never been held to be punishment."). In determining next whether the statute is excessive, i.e., not narrowly tailored, the Court relies on the legislative history of § 236(c), which outlines the following governmental purposes for the statute: 1) protecting the public from potentially dangerous criminal aliens; 2) preventing aliens from absconding during removal proceedings; 3) correcting procedures under which twenty percent of criminal aliens released on bond did not report for deportation hearings; and 4) restoring public faith in the immigration system. *See* S.Rep. No. 104–48, 1995 WL 170285 at 1–6, 9. These goals are indubitably legitimate governmental objectives. *See Salerno*, 481 U.S. at 747, 107 S.Ct. 2095 (preventing danger to the community is legitimate regulatory goal); *Rogowski*, 94 F.Supp.2d at 184 (goals of § 236(c) are "reasonable and legitimate").

The same legislative history, however, reveals the gap between the these decidedly legitimate goals and the means chosen to achieve them. A closer analysis of legislative history cited by the government, which for the most part describes Congress' desire to expedite the removal of criminal aliens and strengthen the laws providing for deportation, reveals that illegal immigration was the focus of Congress' ire. *See* 142 Cong. Rec. S3329, 1996 WL 174902 (daily ed. Apr. 15, 1996) (remarks of Sen. Abraham) ("Mr. President, those who refuse to play by the rules who come here illegally become, as a result, a burden on our society, and it should not be tolerated. The illegal immigration is a betrayal of our long tradition of welcoming those who play by the rules. If the Federal Government did its job of keeping out, tracking down, and expelling illegal aliens, we would not have an immigration problem that confronts America today."); Sen. Jud. Comm. Rep. No. 104–249 at 7, 1996 WL 180026 ("Aliens who violate *U.S. immigration laws* should be removed from this country as soon as possible") (emphasis added); S.Rep. No. 104–48 at 3, 1995 WL 170285 ("Congress should consider requiring the detention of all criminal aliens *who are in the country illegally* pending deportation, and prohibit the INS from releasing such criminal aliens on bond while providing them with work permits.") (emphasis

added); 142 Cong. Rec. S11506, 1996 WL 565563 (daily ed. Sept. 27, 1996) (remarks of Sen. Hatch) (detention of criminal aliens is important "if we are going to fight and win this battle *with regard to illegal immigration.*") (emphasis added).

Further, that part of the legislative history which explicitly addressed the subject of aliens convicted of crimes, rather than aliens whose presence in this country was unlawful, does not reflect consideration of deportable permanent legal resident aliens eligible for discretionary relief from deportation. For instance, a Senate Report entitled "Criminal Aliens in the United States" reports that "[o]ver 20 percent of nondetained criminal aliens fail to appear for deportation proceedings," S.Rep. No. 104–48, 1995 WL 170285 (Ap.7, 1995), and that "[t]hrough 1992, nearly 11,000 criminal aliens convicted of aggravated felonies (which are particularly serious crimes) failed to appear for deportation hearings." *Id.* As noted in *Rogowski,* this twenty percent absconment rate means that "[e]ighty percent do not abscond." 94 F.Supp.2d at 185. Nor does the statistic regarding aliens convicted of "particularly serious crimes" reflect a careful analysis of aliens in petitioner's situation, such that the statute could be considered 'narrowly tailored' to such aliens, since unlike petitioner, aggravated felons are not even eligible for discretionary relief. As for future dangerousness, the statistic regarding recidivism quoted in Senator Abraham's remarks on the floor as support for the mandatory detention provision, *see* 141 Cong. Rec. S7803, 7823, was based on a sample composed of almost 95 percent illegal immigrants. *See* Countywide Criminal Justice Coordination Comm., *Criminal Aliens in the Los Angeles County Jail Population,* Final Report Nov. 1990 (noting that 116 of inmates in sample were permanent residents, while 1,625 were illegal entrants).

The above legislative history does not support the government's claim that the statute meets the second prong of the *Salerno* test. None of the statistical conclusions cited refer to aliens in the circumstances of petitioner—lawful permanent residents who are not yet subject to an administratively final order of removal and who are eligible for discretionary relief. By including aliens in the position of Ms. Cardoso within the reach of the mandatory detention provision, without record of any specific consideration of and factual basis for such inclusion, and absent any statutory provision for individualized assessment as to whether the presumptive need for detention applies, the means chosen by Congress to achieve its valid regulatory goals works a deprivation on Ms. Cardoso's fundamental liberty right that is excessive in relation to the purpose for that deprivation. As the *Small* court reasoned, applying a presumption of flight risk to aliens such as Ms. Cardoso is, in fact, counter-intuitive, because as her last opportunity to remain lawfully in the United States, Ms. Cardoso has every incentive to attend the § 240A hearing at which her removability will be determined. *See Small,* Ruling at 27.

The Court recognizes that the government's interest in preventing aliens with felony convictions from absconding or committing further crimes is compelling, and perhaps some permanent resident aliens faced with removal and a § 240A hearing would nonetheless "jump bond" if released. But given that a fundamental right is involved, § 236(c) sweeps too broadly, because denying individual bond hearings imputes a generalized intent to abscond or endanger society to all deportable aliens, regardless of their circumstances, the nature of their crime, or the potential that they may be allowed to remain in this country permanently. Petitioner's detention under this generalized assumption is arbitrary, in that it is without regard to her circumstances, in light of the lack of any consideration of lawful permanent residents with a chance at discretionary relief, and whether they present similar flight or recidivism risks in the legislative history.

*See Carlson,* 342 U.S. at 538, 72 S.Ct. 525 ("Of course purpose to injure could not be imputed generally to all aliens subject to deportation.").

The government's position that the fact of the petitioner's alien status combined with her criminal convictions is a sufficient predictor of future criminality and abscondment risk that obviates the need for any further protections is substantially undermined by the Second Circuit's recognition of aliens' substantive due process rights, and the regulatory, non-punitive purpose of the detention at issue. It is further undercut by the absence of any durational restrictions on petitioner's mandatory detention. Congress, while intending speedy hearings and an expedited removal process, failed to include any express time limitations in § 236(c). The length of Ms. Cardoso's detention depends solely on bureaucratic happenstance or vagaries of scheduling her hearing on discretionary relief and appeals, unfettered by any statutory timelines. The government maintains the indefinite detention under § 236(c), as a practical matter, has an endpoint because once the deportation processing is completed and a final order is issued, the alien is entitled to a bond hearing under § 241(a) if not removed in 90 days. *See* 8 U.S.C. § 1231(a)(3). The most that this "endpoint" to mandatory detention seems to demonstrate, however, is the inadequate tailoring of § 236(c) to its purported purpose, because, illogically, aliens with a final order of removal who thus present far more of a flight risk may be considered for release on bond, but those with great incentives to appear before an immigration judge to show their worthiness to remain in this country, may not.

■ The Court thus concludes that the irrebuttable presumption of flight and danger risk resulting in this blanket rule of detention as applied to petitioner under § 236(c) is excessive in relation to the governmental purposes of limiting abscondment of deportable criminal aliens and preventing future danger to the community. All of the interests advanced by the government as justifying the infringement on petitioner's fundamental liberty interests can be satisfied by conducting individualized bail hearings that carefully assess the petitioner's risk of flight and criminal recidivism. *See Baidas v. Jennings,* 123 F.Supp.2d 1052, 1061 (E.D.Mich.1999); *see also Welch,* 101 F.Supp.2d at 356.

The government offers no justification for requiring the blanket rule over individualized determinations for aliens of Ms. Cardoso's status, other than deference to Congressional decisions on immigration policy, and its insistence that petitioner has no fundamental liberty interest, which the Court has rejected for the reasons discussed above. Ms. Cardoso is clearly not entitled as a matter of constitutional right to the full panoply of safeguards given criminal defendants, and Congress certainly could place timing and procedural restrictions on such individualized determinations, such as imposing the burden of proof on the alien to rebut a presumption of dangerousness or abscondment risk, or limiting the government's proof necessary for detention to merely a preponderance of the evidence, or requiring such hearings to be held only after a reasonable time period for conducting INS administrative proceedings. Such statutory tailoring might very well pass constitutional muster, for "Congress regularly makes rules [for aliens] that would be unacceptable if applied to citizens." *Doherty,* 943 F.2d at 209. But a Congressional enactment may not infringe upon petitioner's fundamental liberty interest without narrowly tailoring the means to achieve the compelling purpose for such infringement.

In summary, the Court concludes that Ms. Cardoso has a fundamental liberty interest in not being detained without some individualized determination of her flight risk and dangerousness, while she remains a permanent legal alien with § 240A relief still available to her, and is not yet subject to an administratively final

116

order of removal. Applying the *Salerno* analysis, the Court finds that § 236(c) detention is regulatory in nature, but as applied to petitioner it is excessive in relation to its purposes, which purposes could be achieved by an individual bond hearing while simultaneously protecting her fundamental liberty right. The Court accordingly holds that the statute is unconstitutional as applied to petitioner, a lawful permanent resident who may still be entitled to remain in this country, and who cannot be required to relinquish her opportunity to apply for discretionary relief by agreeing to deportation in order to be free from custody.

B. *Procedural Due Process*

■ The petitioner also contends that § 236(c) does not survive procedural due process scrutiny because the private interest is fundamental, the risk of erroneous deprivation is high, and the government's burden is slight, compared to the rights at stake. Mem. in Supp. at 12, *citing Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The Court agrees with the government that this aspect of Ms. Cardoso's claim is simply her substantive due process argument recast in "procedural due process" terms. *See Flores*, 507 U.S. at 308, 113 S.Ct. 1439. While Ms. Cardoso does seek additional procedural protections, in the form of an individualized bail hearing, the terminology of the remedy she seeks does not convert her claim into a procedural one. As the Supreme Court has held, "procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property," *Carey v. Piphus*, 435 U.S. 247, 259, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Procedural due process protections are designed to help ensure accuracy in the truth finding process, and so are shaped to minimize substantively unfair or mistaken deprivations of life, liberty, or property by enabling persons to contest the basis upon which a State proposes to deprive them of protected interests. *Fuentes v. Shevin*, 407 U.S. 67, 81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Ms. Cardoso, in contrast, does not argue that the INS was mistaken in applying § 236(c) to her or in detaining her; instead, she challenges the substantive constitutional underpinnings of the statute pursuant to which the government acted. In other words, it is the deprivation itself that is at issue here—the deprivation of the opportunity to challenge the statutory presumption. Without a substantive right, a deprivation resulting from the irrebuttable presumption in · § 236(c) cannot be "mistaken," because the statutory presumption requiring her detention would be substantively valid.

Counsel for petitioner acknowledged at oral argument that Ms. Cardoso's constitutional claim stands or falls on the Court's resolution of the substantive due process question. As the Court has already found the statute unconstitutional on substantive due process grounds, the Court declines to revisit the question in the guise of a procedural due process claim. Procedural process protects different interests than are at stake in the instant case, and conflating the substantive and procedural analysis will provide no further remedy to petitioner.

The Court acknowledges that other district courts have disposed of similar procedural due process challenges to § 236(c) differently. Courts finding a violation of substantive due process almost invariably find a procedural violation as well, reasoning that the importance of the private interest weighs heavily in the *Mathews* balancing test. *See, e.g., Koita v. Reno*, 113 F.Supp.2d 737, 741 (M.D.Pa.2000). Courts going the other way on the substantive due process question have correspondingly found that the private interest is exceedingly limited, and outweighed by the government's interest, *see, e.g., Reyes*, 73 F.Supp.2d at 658, or have concluded that since the alien has no substantive rights, the absence of any procedural protections

poses no constitutional problem. *See Galvez,* 56 F.Supp.2d at 648. In this Court's view, petitioner's constitutional challenge to § 236(c) is, at bottom, a substantive due process challenge, not a procedural claim, and the Court respectfully disagrees with those courts that have found to the contrary. *See, e.g., Zgombic,* 89 F.Supp.2d at 234 (holding that § 236(c) survived strict scrutiny on substantive due process grounds, but concluding that petitioner had a distinct procedural due process right to a hearing). The Court accordingly denies the petition, to the extent it is predicated on the procedural due process claim.

## IV. *CONCLUSION*

Ms. Cardoso's fundamental liberty interests are unconstitutionally infringed by § 236(c), in that the statute is excessive in relation to its regulatory goals of preventing flight and protecting the community from future crimes. While she has no absolute right to liberty or to remain in this country, substantive due process requires an individualized hearing on the necessity of detaining petitioner pending the completion of her § 240A proceedings. Petitioner has no separate procedural due process right to such a hearing, however. Accordingly, the Court GRANTS Ms. Cardoso's Petition for a Writ of Habeas Corpus on substantive due process grounds, and orders the respondents to afford the petitioner an immediate bond hearing.

IT IS SO ORDERED.