# Limitations on the Detention Authority of the Immigration and Naturalization Service

The Immigration and Nationality Act by its terms grants the Attorney General a full 90 days to effect an alien's removal after the alien is ordered removed under section 241(a) of the Act, and it imposes no duty on the Attorney General to act as quickly as possible, or with any particular degree of dispatch, within the 90-day period. This reading of the Act raises no constitutional infirmity.

It is permissible for the Attorney General to take more than the 90-day removal period to remove an alien even when it would be within the Attorney General's power to effect the removal within 90 days. The Attorney General can take such action, however, only when the delay in removal is related to effectuating the immigration laws and the nation's immigration policies. Among other things, delays in removal that are attributable to investigating whether and to what extent an alien has terrorist connections satisfy this standard. An obligation to act with "reasonable dispatch" will attach at some point after the expiration of the 90-day removal period.

February 20, 2003

MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL

Your Office has asked us to address two questions concerning the timing of removal of an alien subject to a final order of removal under section 241(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(a) (2000). First, your Office has asked us to determine whether the Attorney General is under an obligation to act with reasonable dispatch in effecting an alien's removal within the 90-day removal period established by section 241(a)(1)(A), 8 U.S.C. § 1231(a)(1)(A). We conclude that the INA by its terms grants the Attorney General a full 90 days to effect an alien's removal after the alien is ordered removed and imposes no duty on the Attorney General to act as quickly as possible, or with any particular degree of dispatch, within the 90-day period. We also conclude that this reading of the Act raises no constitutional infirmity. In particular, even under the Supreme Court's recent decisions, such as *Zadvydas v. Davis*, 533 U.S. 678 (2001), the "substantive" component of the Due Process Clause does not impose a requirement that the Attorney General act with particular dispatch *within* the 90-day removal period. To the extent that the INS General Counsel's Office has issued advice to the contrary, suggesting that there is such a constitutionally-based timing obligation, we disagree with that analysis. While the Attorney General's ability to delay removal of an alien within the 90-day period is not constrained by a particular timing requirement (i.e., an obligation to act with dispatch), it is also not entirely unconstrained. We conclude that an express decision to postpone removal of an alien until later in the 90-day period likely must be supported by purposes related to the proper implementation of the immigration laws. We need not definitively resolve that question here because the delays in the particular case your Office inquired about were clearly supported by purposes related to proper implementation of the immigration laws.

Second, your Office has asked—in a situation where it would be logistically possible to remove an alien within the 90-day removal period—whether and for what purposes the Attorney General may nonetheless refrain from removing the alien within the removal period and instead detain him beyond the 90-day period with a view to removing him at a later time. We conclude, under each of two alternative readings of the statute, that it is permissible for the Attorney General to take more than the 90-day removal period to remove an alien even when it would be within the Attorney General's power to effect the removal within 90 days. The Attorney General can take such action, however, only when the delay in removal beyond the 90-day period is related to effectuating the immigration laws and the nation's immigration policies.

## I.

These issues arose in the context of the case of a particular alien who received a final order of removal on October 1, 2002, and whose 90-day removal period thus expired on December 30, 2002. This alien has significant connections to a known al Qaeda operative who was seized in Afghanistan and who is now held at the naval base at Guantanamo Bay, Cuba. It was deemed a substantial possibility that the alien himself was a sleeper agent for al Qaeda. Insufficient information existed at first, however, to press criminal charges or to transfer the alien to military custody as an enemy combatant. When it became apparent that it would be logistically possible to remove the alien very early within the 90-day removal period to the country that had been specified at the removal hearing (i.e., travel documents were obtained), the question arose whether his removal could be delayed to permit investigations concerning his al Qaeda connections to continue. Several avenues remained for developing further information about the alien, and such information would have been relevant for several purposes. For example, at first, your Office had been informed by the INS that the alien had designated a particular country of removal under section 241(b)(2)(A) of the INA, 8 U.S.C. § 1231(b)(2)(A). In that case, the Attorney General would have had statutory authority to disregard that designation if he determined that removing the alien to that country would have been "prejudicial to the United States." *Id.* § 1231(b)(2)(C)(iv). Obviously, in order for him to make that determination, it would have been important for the Attorney General to have the fullest information possible about the alien's terrorist connections, the extent of the threat he posed, and the ability (and willingness) of the law enforcement or security services of the destination country to deal appropriately with the alien. On further examination of the record, the INS later informed your Office that the alien had not, in fact, designated any country of removal. That situation raised unresolved questions of statutory interpretation concerning the Attorney General's authority under the statute to determine the country of removal—a decision that, again, depending upon the scope, if any, of the Attorney General's discretion, could obviously

benefit from the fullest information possible about the alien's terrorist connections. In addition, even apart from the question of the country to which the alien would be removed, full information about the alien's terrorist connections was critical for ensuring coordination with the law enforcement and security services in the country of removal before removing the alien. Ensuring such coordination based upon the fullest information about the threat posed by the alien would have promoted both the national security interests of the United States (by perhaps providing a basis for law enforcement officials in the destination country to detain the alien) and the foreign policy interests of the United States in maintaining good relations with the country. Other countries ordinarily would prefer not to have potential terrorists sent to their shores without adequate warning. Finally, if enough further information had been developed concerning the alien, a different course of action might have been taken with respect to him, such as criminal prosecution or detention as an enemy combatant.

These circumstances also raised the possibility that significant information might be developed concerning the alien at or near the end of the 90-day period. As a result, if it were lawful to do so, the Attorney General might have wanted to take more than 90 days to execute the removal order and thus to detain the alien beyond the 90-day removal period.

## II.

Whether the Attorney General is required to effect an alien's removal as quickly as possible within the 90-day removal period established by section 241(a)(1)(A), 8 U.S.C. § 1231(a)(1)(A), is a question of statutory interpretation. In determining the meaning of a statute, we begin by examining its text. *TVA v. Hill*, 437 U.S. 153, 184 n.29 (1978). "[W]e begin with the understanding that Congress 'says in a statute what it means and means in a statute what it says there.'" *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 6 (2000) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)). Section 241(a)(1)(A) of the INA states that "[e]xcept as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period')." Section 241(a)(2) provides that "[d]uring the removal period, the Attorney General shall detain the alien." The meaning of the statute is plain on its face: the Attorney General is granted a full 90 days after an alien has been ordered removed to effect the alien's removal. During that period, the Attorney General is to detain the alien. The statute does not impose a duty on the Attorney General to remove aliens as quickly as possible within the 90-day removal period, nor does it purport to prescribe the reasons for which the Attorney General might decide to act more quickly or more slowly in effectuating a particular removal within the 90-day period.

Where, as here, the language of a statute is clear, there is no need to resort to legislative history to elucidate the meaning of the text. *See, e.g.*, *Hill*, 437 U.S. at

184 n.29. Nevertheless, we note that the legislative history here is consistent with the reading of the plain text given above—it confirms that Congress intended to give the Attorney General a full 90 days as a reasonable period of time within which to effect an alien's removal. The predecessor provision to the current section 241(a)(1) appeared at 8 U.S.C. § 1252(c) (1994), and provided that:

> When a final order of deportation under administrative processes is made against any alien, the Attorney General shall have a period of six months from the date of such order, or, if judicial review is had, then from the date of the final order of the court, within which to effect the alien's departure from the United States . . . . Any court of competent jurisdiction shall have authority to review or revise any determination of the Attorney General concerning detention, release on bond, or other release during such six-month period upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case of any alien to effect such alien's departure from the United States within such six-month period.

When Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, it shortened the removal period from six months to 90 days and eliminated any reference from the INA to a requirement that the Attorney General proceed with "reasonable dispatch" in effecting an alien's deportation. Congress seems to have viewed its newly-established 90-day time frame as a per se reasonable period of time in which to effect an alien's deportation, rendering judicial inquiry into the dispatch with which the Attorney General performed the duty unnecessary. Neither the text of the statute nor its legislative history provides any reason to believe that Congress intended to impose on the Attorney General an implicit requirement that he remove aliens from the country as quickly as possible within the 90-day removal period.

It might be argued that the plain-text reading outlined above raises constitutional issues that require a narrowing construction of the statute to limit the Attorney General's authority to use the full 90-day period for effecting removal. It is settled, of course, that where there are two or more plausible constructions of a statute, a construction that raises serious constitutional concerns should be avoided. *See, e.g.*, *Crowell v. Benson*, 285 U.S. 22, 62 (1932). There are two arguments that might be raised for a constitutional narrowing construction here.

First, in light of the Supreme Court's decision in *Zadvydas*, it might be claimed that the government is under an obligation, even within the 90-day statutory period, to act with reasonable dispatch to remove the alien as quickly as possible. The claim would be, in other words, that it would be unconstitutional for Congress

to grant the Attorney General 90 days in which to effect an alien's removal without any obligation that he act quickly within those 90 days. We reject this view and conclude that the Constitution imposes no obstacle to such a grant of authority.

Second, also in light of the decision in *Zadvydas*, it might be argued that, if it becomes clear at a point during the removal period that an alien can be removed, the Constitution imposes some constraints on the *purposes* for which removal may nevertheless be delayed (and detention continued) until later in the 90-day period. The *Zadvydas* Court explained that detention under the INA must be related to the purpose for which detention is authorized—securing the alien's removal. It thus might be argued that an express decision to delay an alien's removal until the end of the 90-day period must be based upon some purpose related to the proper execution of the immigration laws. As explained below, we conclude that the Constitution may require that the statute be read to include such a limitation. We need not definitively resolve the hypothetical question whether removal could be delayed for a reason wholly unrelated to executing the immigration laws, however, because in the instant case multiple bases existed for delaying the removal of the alien in question that were directly related to the broad considerations the Attorney General is charged with taking into account in enforcing the immigration laws.[1]

## A.

It is doubtful that the terms of section 241(a)(1)(A) could plausibly be construed to include a reasonable-dispatch requirement, particularly in light of Congress's explicit deletion of any such requirement from the statute when it enacted the IIRIRA in 1996. *Cf. Salinas v. United States*, 522 U.S. 52, 60 (1997) (principle of constitutional avoidance does not permit pressing statutory construction "to the point of disingenuous evasion"). We need not resolve that particular issue, however, because reading the statute not to include a reasonable-dispatch requirement—which, as we have outlined above, is the best reading of the text— does not raise any serious constitutional questions.

In *Zadvydas*, the Supreme Court held that the Constitution required reading an implicit limitation into section 241(a)(6) of the INA, 8 U.S.C. § 1231(a)(6), restricting the detention of an alien beyond the 90-day removal period "to a period reasonably necessary to bring about that alien's removal from the United States." 533 U.S. at 689. The Court read this limitation into the statute because, in its view, "[a] serious constitutional problem [would arise] out of a statute that . . . permits an indefinite, perhaps permanent, deprivation of human liberty without any

---

[1] Of course, it is also implicit in the granting of any authority to an executive officer that it may not be exercised in a manner that is expressly constitutionally proscribed. Thus, the Attorney General could not, for example, delay the removal of an alien solely as a mechanism for imposing punishment on the alien. *See, e.g.*, *Wong Wing v. United States*, 163 U.S. 228, 238 (1896).

[procedural] protection." *Id.* at 692. Thus, the Court ruled that if a habeas court determines that "removal is not reasonably foreseeable [during post-removal-period detention], the court should hold continued detention unreasonable and no longer authorized by statute." *Id.* at 699–700.

It could be argued that a constitutional limitation restricting the government's authority to detain an alien to a period "reasonably necessary to bring about that alien's removal" necessarily entails an obligation that the government proceed with reasonable dispatch in effecting removal and remove the alien as soon as reasonably practicable to do so. Even if that were a valid interpretation of the limitation imposed by *Zadvydas* on post-removal-period detention under section 241(a)(6)—an issue that we need not definitively decide in this portion of our analysis—that limitation is inapplicable to detention *within* the 90-day removal period established by section 241(a)(1)(A). The constitutional concerns that motivated the *Zadvydas* Court simply do not arise in the context of detention within the removal period.

In *Zadvydas*, the Court made clear that the central concern informing its constitutional analysis was that the detention it was addressing was "not limited, but potentially permanent." 533 U.S. at 691. *See also id.* at 692 (stressing the "indefinite, perhaps permanent deprivation of human liberty" at stake). The 90-day removal period, by contrast, is of a fixed and relatively short duration. Indeed, the *Zadvydas* Court expressly distinguished detention during the 90-day removal period from the detention it was addressing on precisely this ground, stating that "importantly, post-removal-period detention, unlike detention pending a determination of removability or during the subsequent 90-day removal period, has no obvious termination point." *Id.* at 697. At least one lower court has ruled that *Zadvydas* is inapplicable to the 90-day removal period on precisely these grounds. *Shehata v. Ashcroft*, No. 02 CIV. 2490 (LMM), 2002 WL 538845, at *2 (S.D.N.Y. Apr. 11) ("Here, on the other hand, the 90 day period is quite limited in time, and serves a rational purpose, to allow INS to effect removal of a person already determined to be removable."); *see also Badio v. United States*, 172 F. Supp. 2d 1200, 1205 (D. Minn. 2001) ("*Zadvydas* does not apply to petitioner's claim because pre-removal-order proceedings do have a termination point.").

The relatively short detention period under section 241(a)(1)(A) makes a critical difference because the holding in *Zadvydas* rests upon considerations of substantive due process. Although the Court did not expressly label its decision as one based on "substantive due process," it made it clear that this was the foundation of its reasoning as it explicitly invoked the Fifth Amendment's Due Process Clause, *see Zadvydas*, 533 U.S. at 690, and at the same time disavowed any concern with procedural deficiencies:

> [W]e believe that an alien's liberty interest is, at the least, strong enough to raise a serious question as to whether, *irrespective of the*

> *procedures used*, the Constitution permits detention that is indefinite and potentially permanent.

*Id.* at 696 (citation omitted) (emphasis added). The grounding of the decision in substantive due process is important because, as a general rule, government conduct violates substantive due process constraints only when it is so extreme and intrusive that it can be said to "shock the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952). The prospect of "indefinite and potentially permanent" detention may shock the conscience of the courts, *Zadvydas*, 533 U.S. at 696, but detention for a limited period of 90 days clearly does not. In fact, several courts called upon to review early immigration statutes that did not specify a fixed period for the government's detention authority settled upon similar time frames in specifying the permissible length of a "reasonable" detention. *See, e.g.*, *United States ex rel. Janavaris v. Nicolls*, 47 F. Supp. 201, 202 (D. Mass. 1942) ("The period of time which judges have found to be appropriate in peace-time varies from one month . . . to four months."); *United States ex rel. Ross v. Wallis*, 279 F. 401, 404 (2d Cir. 1922) (holding that four months is a reasonable time); *Caranica v. Nagle*, 28 F.2d 955, 957 (9th Cir. 1928) (holding that two months is a reasonable time); *Saksagansky v. Weedin*, 53 F.2d 13, 16 (9th Cir. 1931) (authorizing the detention of an alien already held for five months for an additional 30 days).

More important, the *Zadvydas* Court expressly held that the detention of an alien for a period of up to six months is presumptively constitutionally reasonable and does not violate substantive due process constraints. *See Zadvydas*, 533 U.S. at 701. If detention for a period of six months to effect removal is presumptively reasonable and does not violate an alien's substantive due process rights, it follows *a fortiori* that detention during the shorter 90-day removal period cannot be constitutionally problematic. *See Borrero v. Aljets*, 178 F. Supp. 2d 1034, 1039 (D. Minn. 2001) ("*Zadvydas* confirms that a legally admitted alien can always be detained during the 90-day 'removal period' contemplated by the statute. But after that, the Court held, the alien can be held for only a 'reasonable period,' which is presumed to be six months"), *rev'd on other grounds*, 325 F.3d 1003 (8th Cir. 2003). Where conduct that "shocks the conscience" is the ultimate touchstone for constitutional analysis, if six months' detention is reasonable, detention for 90 days is simply below the threshold for substantive due process constitutional concerns. Indeed, *Zadvydas* makes the constitutionality of detention during the 90-day removal period even clearer than this, because the six-month "presumptively reasonable" period established by that decision may very well not begin to run until *after* an alien has already been detained for the 90-day removal period.[2]

---

[2] *Zadvydas* does not make it clear whether the six-month "presumptively reasonable" period begins at the end of, or encompasses, the 90-day removal period. *Zadvydas*, 533 U.S. at 700–01. The lower courts appear to be split on the issue. *Compare Borrero v. Aljets*, 178 F. Supp. 2d 1034, 1040–41 (D. Minn. 2001) ("As interpreted by the Supreme Court in *Zadvydas*, § 1231(a)(6) authorizes the INS to detain aliens for six months after the expiration of the 90-day removal period.") (emphasis added), *with*

Substantive due process constraints thus do not afford any basis for reading a "reasonable dispatch" requirement into section 241(a)(1)(A).

In addition, because this particular case involves removal of an alien with demonstrated ties to members of a terrorist organization with which the United States is currently at war, it is even plainer that detention for 90 days without any obligation on the government to act quickly cannot be a concern of constitutional dimensions under the reasoning in *Zadvydas*. In outlining the constitutional problems with potentially indefinite detention, the Supreme Court made it express that the principles it was applying might very well not apply to the government's actions dealing with aliens suspected of involvement in terrorism. The Court distinguished that context, saying that "we [do not] consider terrorism or other special circumstances where special arguments might be made for forms of preventive detention and for heightened deference to the judgments of the political branches with respect to matters of national security." 533 U.S. at 696. Indeed, the Court implied that the government's interest in preventing terrorism is sufficiently great that detention measures specifically targeting "suspected terrorists" are deserving of heightened judicial deference. *See id.* at 691. Thus, the Court suggested that, in the context of an alien suspected of involvement in terrorism, detention might well be justified beyond the six-month period of detention that the Court deemed presumptively constitutionally reasonable for any case. As a result, whereas here, investigation to determine whether an alien is connected to a terrorist organization is part of the justification for prolonging detention and the detention remains confined *within the 90-day removal period*, there can be no basis for concluding that substantive due process constraints are implicated.

Although we conclude, based on the reasoning of *Zadvydas*, that the Constitution does not require that a "reasonable dispatch" obligation be read into section 241(a)(1)(A), one line of lower court decisions regarding the substantive due process implications of prolonged detention should be briefly distinguished. Certain lower courts addressing pretrial detention in the criminal justice system have held that lengthy detention may violate substantive due process constraints under certain circumstances and that evaluating a claimed violation "requires assessment on a case-by-case basis, since due process does not necessarily set a bright line limit for length of pretrial confinement." *United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986). *See also United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir. 1986). It might be thought that those cases call into question our blanket conclusion that detaining aliens for a period of 90 days does

---

*Malainak v. INS*, No. 3-01-CV-1989-P, 2002 WL 220061, at *2 (N.D. Tex. Feb. 11, 2002) ("the Court opined that a presumptively reasonable period of detention was between the ninety days provided for by the IIRIRA and six months") (emphasis added). In November 2001, the Department issued regulations reflecting an assumption that the presumptively reasonable six-month period from *Zadvydas* includes the 90-day removal period. 8 C.F.R. § 241.13(b)(2)(ii) (2002). The choice to treat the six-month period in that fashion in the regulation, of course, is not definitive on constitutional *requirements* for measuring the six-month period.

not violate substantive due process guarantees, even where the Attorney General fails to act with reasonable dispatch. The purpose for the case-by-case inquiry engaged in by the courts in those cases, however, is to examine factors *other* than length of confinement that the courts deemed relevant to the substantive due process inquiry—such as which party is primarily responsible for any delays. *See, e.g.*, *Gonzales Claudio*, 806 F.2d at 340 ("we also consider the extent to which the prosecution bears responsibility for the delay that has ensued"). If the factor of length of confinement is viewed in isolation, applicable case law makes it crystal clear that a 90-day detention period is not constitutionally objectionable, and that no case-by-case inquiry into the length of confinement is therefore required. As we have already mentioned, *Zadvydas* explicitly states that civil detention for a period of six months in the context of deportation is presumptively constitutionally reasonable, *see* 533 U.S. at 701, and even cases examining the constitutionality of prolonged pretrial detention have typically begun their analysis by presuming that the 90-day period established by the Speedy Trial Act is a reasonable detention period. *See, e.g.*, *Gonzales Claudio*, 806 F.2d at 340–41 (citing 18 U.S.C. § 3164(b)).

Moreover, precedents relating to preventive pretrial detention in criminal cases are not directly applicable to the context of detention incident to removal. In distinguishing its own pretrial detention precedent from the context of immigration proceedings, the Second Circuit noted that "a deportation proceeding is not a criminal proceeding . . . and the full trappings of legal protections that are accorded to criminal defendants are not necessarily constitutionally required in deportation proceedings." *Dor v. INS*, 891 F.2d 997, 1003 (2d Cir. 1989). In a later decision, the Second Circuit elaborated on this distinction:

> It is axiomatic, however, that an alien's right to be at liberty during the course of deportation proceedings is circumscribed by considerations of the national interest. Control over matters of immigration and naturalization is the "inherent and inalienable right of every sovereign and independent nation." *Fong Yue Ting v. United States*, 149 U.S. 698, 711, 13 S.Ct. 1016, 1021, 37 L.Ed. 905 (1893). . . . In exercising its broad power over immigration and naturalization, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews*, 426 U.S. at 80, 96 S.Ct. at 1891. Governmental conduct that may be considered "shocking" when it serves to deprive the life, liberty or property of a citizen may not be unconstitutional when directed at an alien.

*Doherty v. Thornburgh*, 943 F.2d 204, 209 (2d Cir. 1991) (citations omitted), *cert. dismissed*, 503 U.S. 901 (1992). Thus, the Second Circuit considers the detention of an alien prior to removal to be constitutionally permissible unless the alien can show that "his continuing detention was the result of an 'invidious purpose, bad

faith or arbitrariness.'" *Ncube v. INS Dist. Dirs. & Agents*, No. 98 Civ. 0282 HB AJP, 1998 WL 842349, at *16 (S.D.N.Y. Dec. 2), *citing Doherty*, 943 F.2d at 212. Especially where the Supreme Court has already established that detention of an alien for a period of six months is presumptively constitutionally reasonable, detention for a period of 90 days in itself cannot possibly satisfy that exacting standard for establishing a violation. Thus, lower court decisions that have examined the substantive due process implications of pretrial detention do not call into question our conclusion that the Constitution does not require that the Attorney General act with reasonable dispatch during the 90-day removal period.

Finally, we note that in January 2002, the INS General Counsel's Office issued an opinion in which it advised that, during the 90-day removal period, the INS is constitutionally required to "proceed[] with reasonable dispatch to arrange removal." Memorandum for Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations, from Dea Carpenter, Deputy General Counsel, *Re: Authority to Detain During the 90-Day Removal Period* at 1 (Jan. 28, 2002) ("INS Memorandum"). Based on the analysis outlined above, we disagree with the INS's conclusion.

The INS derived the reasonable-dispatch requirement from language in *Zadvydas* construing section 241(a)(6) and stating that "the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." INS Memorandum at 2, *citing Zadvydas*, 533 U.S. at 689. The INS reasoned that, "while the *Zadvydas* opinion is technically limited to post-removal period detention, and while the statute provides authority to detain an alien with a final order of removal for up to the 90-day removal period, the INS should not continue to detain an alien during the removal period beyond the point at which the alien could be removed except to the extent that the INS is taking necessary actions to process the alien for removal." INS Memorandum at 3. In our view, this conclusion was in error because it mistakenly applies the limitations on post-removal period detention under section 241(a)(6) to removal-period detention under section 241(a)(1)(A). As explained above, neither the plain language of section 241(a)(1)(A) nor its legislative history allows any inference that Congress intended to impose a reasonable-dispatch obligation on the INS during the 90-day removal period. Moreover, the constitutional concerns that impelled the Supreme Court to read such an obligation into section 241(a)(6) simply are not applicable to detention during the 90-day removal period. In *Zadvydas*, the Supreme Court reasoned that because indefinite civil detention of lawfully admitted aliens would raise serious constitutional questions, detention must be limited to a period reasonably necessary to effect removal. The *Zadvydas* Court expressly distinguished the 90-day removal period, however, on the ground that it has a defined termination point. 533 U.S. at 697. Lower courts, accordingly, have held that *Zadvydas*'s constitutional reasoning is inapplicable to detention during the removal period. *See Shehata*, 2002 WL 538845, at *2. In short, we disagree with

the INS's reading of *Zadvydas*, and reaffirm our conclusion that the Constitution does not impose a reasonable-dispatch obligation during the 90-day removal period.[3]

## B.

The second argument that might be raised for a constitutionally based narrowing construction of section 241(a)(1)(A) would rest on the theory that, once all of the mechanical steps that are necessary to effectuate an alien's removal have been taken, the Constitution imposes some limitations on the purposes for which it is permissible to further delay the alien's removal while keeping the alien in detention. In *Zadvydas*, the Supreme Court explained that the reasonableness of an alien's detention must be measured "primarily in terms of the statute's basic purpose," which the Court identified as securing the alien's removal. *Zadvydas*, 533 U.S. at 699. Similarly, in the wake of *Zadvydas*, the Third Circuit has stated that "[t]he requirements of substantive due process are not met unless there is a close nexus between the government's goals and the deprivation of the interest in question." *Patel v. Zemski*, 275 F.3d 299, 311 (3d Cir. 2001). Thus, the INS has taken the position, both in the INS Memorandum and in some instances of prior litigation, that it does not have the power to detain aliens for any purpose other

---

[3] The INS Memorandum also cites at length several decisions addressing the impact of INS detention on triggering the Speedy Trial Act where it appears that the INS has held an alien solely for the purpose of allowing a criminal investigation (into the same conduct that forms the basis for deportation) to proceed. *See* INS Memorandum at 3–4. It is unclear to what extent, if at all, the INS intends to rely on these cases for the proposition that the INS must act with reasonable dispatch. Instead, the INS relies on them primarily for the proposition that the INS can detain an alien solely for purposes of effecting removal, an issue we address below. *See infra* Part II.B. In any event, the Speedy Trial Act cases provide no support for any general obligation on the INS to act with dispatch. Rather, they establish solely that, when an alien is prosecuted for the same conduct that formed the basis for the immigration violation on which he was held and when the INS has delayed deportation (and prolonged detention) solely to permit the criminal investigation to proceed, the INS detention may trigger the deadlines of the Speedy Trial Act. That, in turn, may lead to a Speedy Trial Act violation that may be raised *in the criminal trial* to seek dismissal of the indictment. *See, e.g.*, *United States v. Garcia-Martinez*, 254 F.3d 16 (1st Cir. 2001); *see also United States v. De La Pena-Juarez*, 214 F.3d 594, 598–99 (5th Cir.), *cert. denied*, 531 U.S. 983 (2000), *and cert. denied*, 531 U.S. 1026 (2000). That consequence for the criminal trial does not mean by any stretch that the INS lacks power to detain the alien for the full 90 days prior to removal or that the INS has a general obligation to act with dispatch during that time. It is true that, in explaining how INS detention solely for purposes of criminal investigation may trigger the Speedy Trial Act, one district court stated in dicta that "[i]n essence, the INS has an obligation to act with all deliberate speed to remove from the United States a detained alien who has been finally determined to be deportable." *United States v. Restrepo*, 59 F. Supp. 2d 133, 138 (D. Mass. 1999). In context, it is clear that all the court was indicating was that, when the sole purpose of detention is providing time for criminal investigation, there may be consequences under the Speedy Trial Act for the prosecution. To the extent that this dictum might be construed to suggest anything further concerning a general obligation to act with dispatch, there is no support in the court's Speedy Trial Act analysis for such a conclusion and it is not a correct statement of the law.

than the effectuation of removal.[4] *See* INS Memorandum at 1; *United States v. Restrepo*, 59 F. Supp. 2d 133, 138 (D. Mass. 1999).[5] Even before *Zadvydas*, in fact, several district courts had expressed the view that, once it has become apparent that an alien cannot be deported, his detention can no longer be said to be for purposes of effecting his removal. *See United States ex rel. Blankenstein v. Shaughnessy*, 117 F. Supp. 699, 703–04 (S.D.N.Y. 1953) ("courts have the power to release on habeas corpus an alien held for deportation on a showing . . . that the detention cannot in truth be said to be for deportation"); *United States ex rel. Kusman v. INS*, 117 F. Supp. 541, 544–45 (S.D.N.Y. 1953); *Rodriguez v. McElroy*, 53 F. Supp. 2d 587, 591 n.6 (S.D.N.Y. 1999) ("[d]etention is intended for the sole purpose of effecting deportation"); *Fernandez v. Wilkinson*, 505 F. Supp. 787, 793 (D. Kan. 1980), *aff'd*, 654 F.2d 1382 (10th Cir. 1981); *Williams v. INS*, No. 01-043 ML, 2001 WL 1136099, at *4 (D.R.I. Aug. 7, 2001).

There is support in the cases for the general principle suggested by the INS to this extent: the detention of an alien—perhaps even during the 90-day removal period—likely must be related to enforcing the immigration laws and properly effecting the alien's removal in accordance with the nation's immigration laws and policies. Thus, in the abstract, it might raise difficult constitutional questions if the Attorney General were expressly to delay the removal of an alien (and thereby prolong his detention) solely for a purpose that was—by hypothesis—entirely unrelated to any legitimate interest in the enforcement of the immigration laws.[6] We need not definitively decide whether such a hypothetical scenario would raise constitutional infirmities, however, because in the present case there are reasons directly related to the enforcement of the immigration laws that justify any delay in the alien's removal.[7] Of course, acknowledging (as we do for purposes of

---

[4] In coming to this conclusion, the INS relies heavily on several cases holding that, when aliens detained by the INS are held solely for the purpose of facilitating a criminal investigation, the detention triggers the provisions of the Speedy Trial Act. *See* INS Memorandum at 3–4. As noted above, however, those cases merely interpret the Speedy Trial Act and the guarantees it provides a defendant *in the context of his criminal case*. It might well be the case that, if the INS were to hold an alien solely for the purpose of permitting a criminal investigation to proceed, there would be a Speedy Trial Act problem in the criminal prosecution. That does not mean, however, that the INS lacked legal authority to detain the alien while the criminal investigation proceeded. We therefore do not view those cases as useful for determining the scope of the INS's authority under section 241(a)(1) of the INA to delay removal of an alien during the 90-day removal period.

[5] *See also* INS Memorandum at 5 ("While nothing in the language of the statute requires that the INS expedite an alien's removal during the 90-day removal period, or that the INS remove an alien at the very earliest point at which travel arrangements can be made . . . detention beyond that point must be related to removing the alien.").

[6] Of course, as noted above, *see supra* note 1, it is also clear that the INS could not prolong an alien's detention for a constitutionally impermissible purpose

[7] Even if other motivations exist in addition to the need to develop information relevant to decisions in the deportation process, to our knowledge it has never been suggested that the existence of additional governmental motivations can undermine or invalidate a detention that is supported by a lawful purpose. *See, e.g.*, *United States ex rel. Zapp v. INS*, 120 F.2d 762, 764 (2d Cir. 1941) (ongoing

analysis here) that the reason for an alien's detention must be related to legitimate interests in enforcing the immigration laws does not in itself provide much concrete guidance for determining precisely what activities meet that test. Rather, it merely frames the next step of the inquiry. Here, we cannot purport by any means to provide a comprehensive assessment of all the tasks or all the inquiries that may meet that standard in the myriad scenarios that may arise. Given the numerous broad objectives that underlie the nation's regulation of immigration—many of which relate to protecting our citizens from harm at the hands of aliens—there are potentially a vast array of interests legitimately related to policing immigration that may have a bearing on the Attorney General's decision (effected through the INS) concerning exactly when during the removal period an alien should be removed.[8] For present purposes, we limit our discussion to the interests relevant in this case.

At a bare minimum, of course, administrative tasks such as making transportation arrangements, securing travel documents, communicating with domestic and foreign law enforcement agencies, and making internal administrative arrangements for escorts and security are all legitimately related to removal. *Accord* INS Memorandum at 4.

In our view, moreover, there is a substantially broader range of immigration-related considerations that the Attorney General is permitted to take into account in effecting the removal of an alien, and thus deciding whether and exactly when to remove an alien. For example, as the Supreme Court acknowledged in *Zadvydas*, the immigration policy of the United States is inextricably intertwined with complex and important issues of foreign policy. *Zadvydas*, 533 U.S. at 700. *See also Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."). Every removal of an alien necessarily involves an act affecting foreign policy because it requires sending the alien to another country. In some cases, the foreign policy implications

---

criminal investigations do not affect the INS's removal authority); *cf. Wren v. United States*, 517 U.S. 806, 811–13 (1996) (holding that subjective motive of officers for traffic stop is irrelevant where stop is supported by probable cause and thus rejecting "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"); *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 491 (1999) (explaining that where an alien's presence in this country is a violation of the immigration laws, he may be deported and the possible existence of additional reasons for the government's focus of enforcement efforts on him is irrelevant; indeed, the "Executive should not have to disclose its 'real' reasons for deeming nationals of a particular country a special threat").

[8] For example, 8 U.S.C. § 1231(c)(2)(A)(ii) makes it express that the Attorney General may stay the removal of an alien stopped upon arriving at a port of entry (who otherwise would be removed "immediately," *id.* § 1231(c)(1)) if the "alien is needed to testify in [a criminal] prosecution." A similar need for an alien's presence in a criminal or civil trial may well be a legitimate concern justifying a delay in removal. We need not decide such questions here.

of that act may be significant. As the Supreme Court has recognized, enforcement priorities in the immigration context may reflect "foreign-policy objectives" and it is even possible that the Executive might wish "to antagonize a particular foreign country by focusing on that country's nationals." *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 491 (1999). *See also Mathews v. Diaz*, 426 U.S. 67, 81 (1976) (noting that decisions relating to immigration "may implicate our relations with foreign powers"); *cf. Fong Yue Ting v. United States*, 149 U.S. 698, 705 (1893) (grounding federal control over ingress and egress of aliens in part in federal government's "entire control of international relations"). More importantly here, releasing criminal or terrorist aliens into another country without providing adequate warning to the appropriate law enforcement or other officials in the receiving country can have adverse consequences for the security of that country, which can lead to the souring of diplomatic relationships or other negative results for foreign policy. Similarly, releasing aliens from United States custody who are suspected of involvement with terrorism can have a profound impact on our own national security. National security is also a concern inherently relevant to policing the flow of persons across our borders under the immigration laws. *See generally Carlson v. Landon*, 342 U.S. 524, 534–36 (1952).

It is not only common sense that makes clear the inherent relationship between enforcing the immigration laws and considerations of both foreign policy and national security; rather, those considerations are embedded in the text of the immigration laws themselves. For example, the fact that an alien's presence in the United States could result in "adverse foreign policy consequences" is *in itself* a grounds for removal under the INA. *See* INA § 237(a)(4)(C)(i), 8 U.S.C. § 1227(a)(4)(C)(i) (2000). Similarly, in certain circumstances, the Attorney General may block the departure of an alien from the United States when it would be deemed prejudicial to national security interests to permit him to depart. *See* 8 C.F.R. § 215.3(b), (c) (2002).

More importantly here, the INA expressly gives the Attorney General authority in many instances to make discretionary decisions bearing upon the removal of an alien based on broad considerations of policy. For example, section 241(b)(2)(C)(iv) provides that "[t]he Attorney General may disregard [an alien's designation of a country to which he would like to be removed] if the Attorney General decides that removing the alien to the country is prejudicial to the United States." Similarly, section 241(b)(2)(E)(vii) provides that the Attorney General is not to remove an alien to certain countries, even if they are willing to accept the alien, if he determines that it is "impracticable" or "inadvisable." By granting the Attorney General authority to make such determinations, Congress made it clear that the broad considerations of foreign policy or national security that might underlie such decisions are directly related to—indeed, are an integral part of—the enforcement of the immigration laws. Where more time is needed for the Attorney General to receive further information bearing on such decisions, the investigation

to generate such information is legitimately related to enforcing the immigration laws and can justify delaying the alien's departure.

Thus, at a minimum, where the Attorney General has a statutorily prescribed decision to make concerning the removal of an alien—such as whether it would be "prejudicial to the United States" to remove him to a particular country—developing the information needed for the Attorney General to make that determination wisely is a task that is related to proper implementation of the immigration laws. It would thus be justifiable to delay an alien's removal while an investigation to develop that information (including information about whether the alien has terrorist or criminal connections) is pursued.

In addition, even where the Attorney General does not have such an express statutory determination to make, we conclude that efforts to investigate an alien's background to determine, for example, ties to terrorist organizations are legitimately related to the process of removal. Full information on such aspects of an alien's background may be critical for a number of purposes. It permits the United States to coordinate appropriately with law enforcement officials in the receiving country to ensure that they are aware of any threats the alien might pose and might potentially benefit the national security interests of both the United States and the receiving country by providing officials in the receiving country a basis for arresting upon arrival an alien who poses a serious threat. Taking such steps to coordinate with the receiving country is part and parcel of the proper implementation of the immigration laws. Delaying departure of an alien until later in the 90-day period in order to continue pursuing such investigations into terrorist ties is thus entirely permissible.[9] It is true that, as a purely mechanical matter, the physical removal of an alien and his transportation might be arranged without thoroughly investigating his background and without taking the time to appropriately inform countries that may be willing to accept him about the results of our

---

[9] We note that the INS appears to agree in principle with the understanding we have outlined here concerning the factors that are legitimately considered in effecting an alien's removal. In discussing "critical aspects of the removal process," the INS has stated as follows:

> It is clearly a legitimate governmental interest that the INS communicate with other law enforcement agencies, both domestic and foreign, and make sure that a particular alien is not wanted for prosecution or needed as part of an investigation, in which case the alien could be transferred into the legal custody of another law enforcement agency. In the context of the investigation into the September 11, 2001 attacks on the Pentagon and the World Trade Center, the United States and the country of removal also have a legitimate interest *in ensuring to the extent possible that a particular alien has no connection with any terrorist organization or activity.*

INS Memorandum at 4 (emphasis added). The full scope of the conclusions that the INS drew from this analysis is not entirely clear. As the text above explains, we conclude that if investigations into an alien's terrorist connections are ongoing during the 90-day removal period, postponing removal until later in the period in order to permit such investigations to continue is permissible. Such investigations are legitimately related to effectuating the removal properly under the immigration laws.

investigations. But there can be no question that time spent on such efforts is nevertheless reasonably related to the enforcement of the immigration laws.

## III.

Your Office has also asked us to determine whether (and under what circumstances) the Attorney General may decide to take longer than the 90-day removal period to remove an alien even where it would be logistically possible to accomplish the removal before the expiration of the 90 days. We conclude, under either of two alternative readings of the statute, that at least certain categories of removable aliens may be held by the INS beyond the 90-day removal period, at least where there are reasons for the delay that are related to carrying out the immigration laws. We note, however, that under the Supreme Court's decision in *Zadvydas*, an obligation to act with "reasonable dispatch" will attach at some point after the expiration of the 90-day removal period.

## A.

Section 241(a) of the INA directs that the Attorney General "shall remove" aliens within 90 days of the date on which they are ordered removed. INA § 241(a)(1)(A). It also indicates, however, that section 241 elsewhere provides exceptions to that general rule. *Id.*[10] Section 241(a)(6) on its face provides such an exception. It states that "[a]n alien ordered removed who is inadmissible under section 212 [1182], removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) [1227] or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period."

The plain text of the provision expressly states, in language indicating a grant of authority, that listed classes of aliens "may be detained beyond the removal period." By its terms it thus grants the Attorney General the power to refrain from removing an alien—and instead to keep him in detention—after the removal period has expired. The statute does not provide any preconditions for the exercise of this authority, other than that the alien must belong to one of the listed categories. Thus, in the *Zadvydas* litigation the United States took the position that "by using the term 'may,' Congress committed to the discretion of the Attorney General the ultimate decision whether to continue to detain such an alien and, if so, in what circumstances and for how long." Brief for the Petitioners, *Ashcroft v. Ma*, 533 U.S. 678 (2001) (No. 00-38), 2000 WL 1784982, at *22 (filed Nov. 24, 2000).

---

[10] The provision reads: "Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days . . . ."

Nothing in the Supreme Court's decision in *Zadvydas* casts any doubt on the validity of the plain-text reading of section 241(a)(6) as an express authorization for the Attorney General to detain—and thus refrain from removing—the listed classes of aliens beyond the removal period. The *Zadvydas* Court held that it would raise serious constitutional questions for Congress to authorize the *indefinite* detention of aliens falling into the listed classes. It thus read into the statute an implicit limitation on the allowable *duration* of post-removal-period detention. 533 U.S. at 689 ("the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States"). The Court also implied that detention beyond the 90-day removal period must be in furtherance of removal-related purposes, as it stated that the reasonableness of a detention should be measured "primarily in terms of the statute's basic purpose, namely assuring the alien's presence at the moment of removal." *Id.* at 699. Nothing in the Court's decision, however, calls into question the central point that section 241(a)(6) constitutes an express source of authority to detain aliens in the listed classes beyond the removal period, albeit subject to the above limitations.

This plain-text reading, moreover, does not lead to an absurd or an unconstitutional result. The statute limits the authority to prolong detention beyond the removal period to particular classes of aliens designated by Congress. The aliens listed in the statute include aliens who were never legally admitted to the country, INA § 212, aliens who violate their nonimmigrant status or their conditions of entry, *id.* § 237(a)(1)(C), criminal aliens, *id.* § 237(a)(2), aliens who are a potential threat to national security, *id.* § 237(a)(4), and aliens deemed by the Attorney General to constitute a flight risk or a danger to the community, *id.* § 241(a)(6). Congress could reasonably have anticipated that in many instances additional time beyond the 90-day removal period would be required to remove these classes of aliens, perhaps because of heightened security concerns, the need to conduct especially thorough background investigations, or the difficulty that might be encountered in finding foreign countries willing to accept such aliens. *Zadvydas* confirms the constitutionality of holding such aliens beyond the 90-day removal period, and establishes that it is constitutionally permissible to hold aliens in confinement "until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." 533 U.S. at 701. Our plain text reading of section 241(a)(6) is thus constitutionally unproblematic.

It might be argued that section 241(a)(6) does not itself constitute an exception to the 90-day rule, but rather merely empowers the Attorney General to *detain*, rather than *release*, aliens who *happen*, for some other reason, to still be in the country at the expiration of the 90-day removal period (for example, because no country would accept them or because their removal was delayed based upon some other source of authority that provides an exception to the command to remove aliens within 90 days). Under this view, section 241(a)(6) would be understood as a parallel provision to section 241(a)(3). Section 241(a)(3) gives

authority to impose supervised release when it happens that an alien has not been removed within the 90-day period. Section 241(a)(6), the argument would go, should be understood as simply a parallel authority to detain the alien in the same circumstance. The difficulty with that approach to the statute is that the two sections are not drafted in parallel terms. Congress demonstrated in enacting section 241(a)(3) that it knows how to phrase language that does not grant an authority to delay removal of an alien beyond the 90-day period, but at the same time does give a power that can be exercised when it happens (for some other reason) that an alien has not been removed by the deadline. Section 241(a)(3) empowers the Attorney General to impose terms of supervised release on an alien "[i]f the alien does not leave or is not removed within the removal period." The quoted language makes it clear that section 241(a)(3) does not itself constitute authorization to delay removal beyond the removal period, but rather merely establishes an authority to impose supervised release in a certain situation—the situation where it happens that alien has not been removed within the 90 days. The reasons *why* the alien has not been removed are not specified, and presumably could include the impossibility of removal or the exercise of some *other* authority to delay removal. The absence of similar conditional language triggering the application of section 241(a)(6)—just three paragraphs later in the same subsection—is a strong textual indication that section 241(a)(6) is not similarly limited. Instead, it was intended to serve as a general authorization for the Attorney General to refrain from removing the listed classes of aliens and to detain them beyond the removal period. It is well settled, after all, that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion and exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).

Finally, we note that there is further textual support for the conclusion that section 241(a)(6) cannot properly be read as applying solely to a situation where it has proven impossible to remove an alien within the 90-day removal period. Here again, Congress knows how to express such a limitation when it wants to impose one, and it did so in the very next subsection of the statute. Section 241(a)(7) allows the Attorney General to authorize employment for those aliens who, although ordered removed, "cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien." That provision explicitly limits a grant of employment authorization to situations where it is impossible to remove an alien because no country is willing to accept him. The absence of similar language from section 241(a)(6) demonstrates that Congress did not intend similarly to limit the Attorney General's discretion in determining when and under what circumstances to detain aliens falling within the listed classes beyond the 90-day removal period.

## B.

Even if section 241(a)(6) did *not* authorize the Attorney General to delay removal of an alien beyond the removal period and instead provided solely authority to detain aliens who happen, for some other reasons, to still be in the country after the removal period, we would still conclude that the Attorney General has statutory authority to delay removal of at least some aliens until beyond the 90-day deadline.

We start with the observation that the text of section 241 makes it clear that Congress did not intend to obligate the Attorney General to remove aliens within the removal period in *all* instances. Despite the mandatory language directing that the Attorney General "shall remove" aliens within the removal period, numerous provisions in section 241 expressly contemplate that aliens who have been ordered removed will still be in the country after the expiration of the removal period. For example, as noted above, section 241(a)(3) establishes standards for supervised release of aliens that apply "[i]f the alien does not leave or is not removed within the removal period." Similarly, under the reading of section 241(a)(6) that we are assuming for this portion of our analysis, that provision provides authority for the Attorney General to detain an alien who has not been removed within the removal period. Both of these provisions assume a situation in which an alien has not been removed by the end of the removal period. They would make no sense if the INA imposed an ironclad legal obligation to effect the removal of all aliens before the removal period ended. Similarly, section 241(a)(7) permits the Attorney General to grant work authorizations to aliens who have been ordered removed and applies only in limited circumstances (such as where no country will accept the alien) that suggest the alien will be in the country well beyond the 90 days.

Other provisions in section 241 reinforce the conclusion that Congress understood that, in at least some instances, aliens would not be removed within the removal period. Section 241(b) establishes a detailed decision tree that the Attorney General must follow in determining to which country an alien should be removed. In some instances, the statute contemplates that the Attorney General may have to negotiate sequentially with as many as nine or more separate countries to secure permission to remove an alien, with each round of negotiations taking as many as 30 days.[11] *See* INA § 241(b)(2). It might simply be impossible to

---

[11] For example, an alien who is to be removed under section 241(b)(2) first has the opportunity to designate the country to which he would like to be removed. *See* INA § 241(b)(2)(A). Once the alien has designated a country, that country is accorded a minimum of 30 days to decide whether to accept the alien. *See* INA § 241(b)(2)(C)(ii). The Attorney General may also override the alien's designation if he determines that removing the alien to the designated country would be "prejudicial to the United States." *See* INA § 241(b)(2)(C)(iv). If the designated country declines to accept the alien, or if the Attorney General overrides the designation, the Attorney General is instructed by the statute to attempt to remove the alien to the country of his nationality or citizenship. *See* INA § 241(b)(2)(D). That country is then accorded a presumptive 30 days by the statute to decide whether to accept the alien, but here the Attorney General is further vested with discretion to alter that time period, raising the

complete this entire process within the 90-day removal period, even without taking into account the time that the Attorney General and his agents must devote to such administrative tasks as securing necessary travel documents and making appropriate security arrangements. Thus, as the Supreme Court acknowledged in *Zadvydas*, "we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time." 533 U.S. at 701.

While the text of section 241 thus makes it clear that there may be instances in which an alien is not removed within the removal period, that in itself does not explain the circumstances that would make it permissible for the Attorney General to fail to accomplish removal within the allotted time. The discussion above does suggest one such circumstance—namely, the situation where it is simply not possible to remove an alien within 90 days because a country has not yet been found that will accept him. As explained above, the detailed decision tree established in section 241(b) sets out a process for finding a country of removal that has various timing provisions built in and that may very well take more than 90 days to complete in some cases. And section 241(a)(7), in permitting the Attorney General to grant employment authorization in some circumstances, acknowledges that there may be instances in which "the alien cannot be removed due to the refusal of all countries" to accept him. It is significant, however, that the statute nowhere provides an express exception to the command to remove aliens within 90 days for such cases of impossibility. Instead, that exception must be implied based on the explicit textual references acknowledging that aliens may, in fact, be in the country past the 90-day period, the nature of the process Congress established for choosing the country of removal (a process that, on its face, may take longer than 90 days), and the assumption that Congress would not extend its command about timing to require the Attorney General to do the impossible.

The question here is whether a similar exception may also be implied under the statute that would permit the Attorney General under certain conditions to *choose* to delay removal of an alien even where it would be possible to remove him by the deadline. It could be argued that impossibility of removal—a circumstance beyond

---

possibility that this step could take even longer. *See* INA § 241(b)(2)(D)(i). If the country of the alien's citizenship or nationality declines to accept the alien, the Attorney General is instructed to attempt to remove the alien to one of six listed countries, including the country in which the alien was born and the country from which the alien was admitted to the United States. *See* INA § 241(b)(2)(E)(i)–(vi). Each of those countries, of course, would have to be separately negotiated with by the United States, and would also have to be given an appropriate amount of time—presumably 30 days—to decide whether to accept or reject the alien. Finally, if none of the six listed countries is willing to accept the alien, or if the Attorney General decides that it would be "inadvisable" to send the alien to any of the listed countries that is willing to accept him, the Attorney General is instructed to remove the alien to any country of the Attorney General's choice whose government is willing to accept the alien. *See* INA § 241(b)(2)(E)(vii). Needless to say, following this decision tree through to its very last step—which Congress must have contemplated would be necessary in at least some cases—would take considerably longer than the 90 days allotted to the Attorney General by section 241(a)(1)(A).

the Attorney General's control—is the *only* circumstance that makes it permissible for the Attorney General to fail to accomplish removal by the 90-day mark. Such a limited exception to the 90-day rule, however, would not be consistent with the nature of the decisions that are entrusted to the Attorney General under the immigration laws. Rather, a similar exception to the 90-day deadline should be understood as implicit in the statute where the time deadline would conflict with the Attorney General's ability properly to enforce the immigration laws, taking into account the full range of considerations he is charged with weighing in accomplishing removal of an alien. The Attorney General is charged by different provisions of section 241, for example, with determining whether it would be "prejudicial to the United States" to remove an alien to the country of his choosing, INA § 241(b)(2)(C)(iv), and with determining whether it would be "inadvisable" to remove aliens to other countries designated by the statutory decision tree, *id.* §§ 241(b)(1)(C)(iv), 241(b)(2)(E)(vii), 241(b)(2)(F). *Cf.* INA § 241(a)(7)(B) (noting circumstances in which Attorney General may make a finding that "removal of the alien is otherwise impracticable or contrary to the public interest"). As explained above, in making these and other similar determinations an essential part of the operation of the immigration laws, Congress has embedded considerations of foreign policy and national security in the decisions that the Attorney General must make in accomplishing the removal of aliens. *See Zadvydas*, 533 U.S. at 700–01. And even where a specific statutory determination is not required, in any situation involving removal of an alien with terrorist connections, weighty considerations of foreign policy and national security bear upon efforts to provide the fullest information possible to the receiving country to promote both its security and the security of the United States. At other times, the health and well-being of an alien, including human rights that are protected by the United States' treaty obligations, must be considered. *See, e.g.*, Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Apr. 18, 1988, S. Treaty Doc. No. 100-20 (1988); INA § 241(b)(3)(A).

In entrusting the Attorney General with the responsibility to make determinations that could have such serious implications, Congress surely did not intend to require him to make determinations in undue haste and without taking the necessary time to conduct thorough investigations, seriously deliberate, confer with other executive agencies, and make an informed decision. If the 90-day deadline were considered an inexorable command, however, it might require precisely such uninformed decision-making. For example, under the decision tree provided by section 241(b), a country willing to accept a particular alien might not be found until late in the removal period, and the Attorney General might then be faced with deciding whether it would be "inadvisable" to remove the alien to that particular country in a matter of days. Where the Attorney General has such a role to perform—and particularly where his decision may rest upon grave concerns for national security—there is no reason to understand the 90-day deadline as an overriding imperative in the statute that may force a premature decision based on

incomplete information or lack of deliberation. Similarly, where the removal of an alien with terrorist connections is at stake and the United States is in the process of investigating information that, if passed along to a receiving country, could have a profound impact on the measures that country could take to ensure both its security and the national security of the United States, there is no reason for thinking that the 90-day deadline was meant to trump due deliberation on such proper considerations under the immigration laws.

In short, in our view, Congress did not intend a rigid time deadline to take precedence in situations where the proper administration of the immigration laws requires additional time. The statute gives no indication that Congress attributed any less importance to discretionary immigration-related determinations entrusted to the Attorney General and his designees than it did to non-discretionary functions such as securing travel documents and finding a country willing to accept an alien. Thus, in our view, the Attorney General is not rigidly bound by the 90-day requirement even in situations where it theoretically would be possible to remove an alien and a foreign country has already signaled its willingness to accept him.

Our conclusion that such an implicit exception to the 90-day deadline should be understood under the statute is also buttressed by the INS's longstanding conclusion that it has implied authority under the statute to refrain from removing aliens within the removal period essentially as a matter of prosecutorial discretion. *See* Memorandum to Regional Directors, etc., from Doris Meissner, Commissioner, Immigration and Naturalization Service, *Re: Exercising Prosecutorial Discretion* at 1 (Nov. 12, 2000) ("INS Prosecutorial Discretion Memorandum"). The INS exercises this discretion even with respect to "executing a removal order," *id.* at 2, despite the fact that doing so will often result in non-compliance with the directive of section 241(a)(1)(A) requiring the Attorney General to remove all aliens within 90 days of the time that a removal order becomes final.

The INS typically exercises its prosecutorial discretion with respect to the execution of final orders of removal through two means. First, 8 C.F.R. § 241.6 provides that an alien "under a final order of deportation or removal" may apply for a stay of removal by filing form I-246. The regulation further provides that "in his or her discretion and in consideration of factors listed in 8 CFR 212.5 and section 241(c) of the Act," certain INS officials "may grant a stay of removal or deportation for such time and under such conditions as he or she may deem appropriate." Although the statutory factors referenced by the regulation appear in provisions that apply only to aliens "applying for admission" and "arriving at a port of entry of the United States" respectively, *see* INA §§ 212(d)(5)(A), 241(c)(2), the INS appears to construe its authority to grant stays to extend more broadly to *all* aliens under a final order of deportation or removal. The instructions accompanying form I-246 state, without limitation, that "[y]ou may file this application if you have been ordered deported or removed from the United States and you wish to obtain a stay of deportation or removal under the provisions of 8 CFR 241.6." Moreover, it is clear that the regulation's cross-references to

statutory provisions are intended only to borrow lists of relevant factors to be considered, not to limit the scope of the regulation to the scope of the statutory provisions. Thus, broad stay authority exercised by the INS pursuant to 8 C.F.R. § 241.6 cannot be derived from any statutory source, but rather is derived from the INS's extra-statutory prosecutorial discretion authority. *See* INS Prosecutorial Discretion Memorandum at 6 (referring to "whether to stay an order of deportation" as one potential exercise of prosecutorial discretion).

Second, the INS may at times exercise its prosecutorial discretion authority by granting a longer-term "deferred action" with respect to the order of removal. The power to grant such deferred action has been "developed [by the INS] without express statutory authorization." 6 Charles Gordon, Stanley Mailman & Stephen Yale-Loehr, *Immigration Law and Procedure* § 72.03[2][h] (rev. ed. 2002). Nevertheless, it has been acknowledged by, and appears to have received the blessing of, the courts. *See Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483–84 (1999) (noting that "[a]t each stage the Executive has discretion to abandon the endeavor" of immigration proceedings, at any time up to and including the execution of removal orders); *Johns v. Dep't of Justice*, 653 F.2d 884, 890 (5th Cir. 1981) ("The Attorney General is given discretion by express statutory provisions, in some situations, to ameliorate the rigidity of the deportation laws. In other instances, as the result of implied authority, he exercises discretion nowhere granted expressly. By express delegation, and by practice, the Attorney General has authorized the INS to exercise his discretion. . . . The Attorney General also determines whether (1) to refrain from (or, in administrative parlance, to defer in) executing an outstanding order of deportation, or (2) to stay the order of deportation. Although such a stay is usually designed to give a deportee a reasonable amount of time to make any necessary business or personal arrangements, both the length of and reason for the stay lie entirely within the discretion of the Attorney General or his delegate.").

The INS thus has long treated the apparent statutory mandate that aliens be removed within the removal period as having implied exceptions and has long exercised its prosecutorial discretion in such a manner as to refrain from removing aliens within the removal period. If that approach is correct (which we need not decide here), and if deferral and stay considerations such as the conservation of limited INS resources, humanitarian concerns, and law-enforcement needs constitute sufficient grounds to refrain from removing an alien within the removal period as directed by section 241(a)(1)(A), then it would seem to follow *a fortiori* that the considerations described above (which are directly relevant to the proper execution of the immigration laws) certainly provide a sufficient basis for a similar implicit exception from the 90-day removal deadline.

Thus, we conclude that the statute permits the Attorney General to delay the removal of an alien beyond the removal period when the failure to effect removal is directly related to the administration of the immigration laws and policies of the United States. This does not give the Attorney General carte blanche to delay an

alien's removal excessively. The delay must be based upon reasons related to the proper implementation of the immigration laws. And as the Court established in *Zadvydas*, where the alien is detained, the Attorney General must complete the removal process within "a period reasonably *necessary* to secure removal," 533 U.S. at 699–700 (emphasis added), a period that the Court concluded presumptively runs for 180 days.[12] This reading of the statute accords the Attorney General the time that he reasonably requires to carry out his immigration-related duties thoroughly and effectively. We could not purport here to define in the abstract a comprehensive list of all the activities that are related to the enforcement of the immigration laws and the completion of which could justify delaying an alien's removal beyond the 90-day time period. At a minimum, delays in removal that are attributable to actions taken by the Attorney General for the purposes discussed above relating to delays *within* the 90-day period—namely, investigating whether and to what extent an alien has terrorist connections—satisfy this standard.

Whether an alien can be detained after the expiration of the 90-day removal period is determined by section 241(a)(6). As explained above, under the reading of section 241(a)(6) that we have assumed for purposes of this portion of our analysis, that provision authorizes the Attorney General to detain aliens who fall into the listed classes and who, despite an order of removal, are still in the country beyond the removal period. Among the classes of aliens who may be detained are aliens who pose a threat to national security or the foreign policy of the United States as set forth in section 237(a)(4) and aliens who are otherwise determined by the Attorney General to be a risk to the community or unlikely to comply with an order of removal. Again, as noted above, *Zadvydas* makes clear that if an alien is detained pending removal beyond the removal period, the Attorney General must act within a period "reasonably *necessary* to secure removal." *Zadvydas*, 533 U.S. at 699–700 (emphasis added). Presumptively, a reasonable period lasts for six months, but the Court made clear that in cases involving suspected terrorism, the same limitations would likely not apply. We cannot attempt here to provide bright-line guidance in the abstract concerning the permissible duration of detention. That may well depend on facts in a particular case.

PATRICK F. PHILBIN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[12] We address here solely a decision to refrain from removing an alien by the 90-day deadline with a view to effecting removal at a later date. A decision in the exercise of prosecutorial discretion not to execute an order of removal at all need not be subject to the same limitations and might be subject to almost absolute discretion of the Attorney General. *See generally* INS Prosecutorial Discretion Memorandum; *see also Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483 (1999) ("[a]t each stage the Executive has discretion to abandon the endeavor" of pursuing removal). We express no view on that issue here.